STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-12-392

CEDAR BEACH/CEDAR
ISLAND SUPPORTERS, INC.,
ROBERT JACKSON, JOHN
FORRER, ROBERTA HELFGOTT,
MARILEAN JOHNSON, JANET
BARIBEAU, and PETER HILL,

        Plaintiffs

v.

JUDGMENT

CHARLES H. ABRAHAMSON,
SALLY M. ABRAHAMSON,
CHARLES H. ABRAHAMSON
LIVING TRUST, SALLY M.
ABRAHAMSON LIVING TRUST,

        and

GABLES REAL ESTATE, LLC,

        Defendants

        and

WELLS FARGO BANK, N.A.,

        Party-in-Interest

RCVD SEP 15 '14 PM 1:29

Jury-waived trial on plaintiffs' amended complaint, filed April 3, 2013,[1] was held on May 27-29, 2014. The transcript was filed on June 16, 2014. Written closing arguments were filed June 30, 2014.

Plaintiffs include Cedar Beach/Cedar Island Supporters, Inc., an entity of approximately 300 members from various states and countries. CBCIS was formed because the members were concerned about the blockade of Cedar Beach

---

[1] The parties stipulated the original complaint was filed October 24, 2012.

Road and the denial of the public's right to access the beach. Plaintiffs also include Robert Jackson, John Forrer, Roberta Helfgott, Pam Johnson, Janet Baribeau, and Peter Hill.[2]

Plaintiffs ask the court to declare the public has acquired a prescriptive easement over Cedar Beach Road on Bailey's Island in Harpswell, Maine. The court has considered the testimony, exhibits, and arguments of counsel. For the following reasons, the court declares the public has acquired a prescriptive easement over Cedar Beach Road.

FINDINGS

A. Property

Dr. Eugene McCarty owned Cedar Beach Road beginning in 1926. He died on May 3, 1957 and the property was transferred by his executrix in 1959.[3] (Pls.' Exs. 1; 4.) Before his death, Dr. McCarty allowed the public to travel down Cedar Beach Road to use Cedar Beach[4] and the small beach[5] at the end of the road.

Dr. McCarty's niece, Julia Sturtevant,[6] and her daughter, Meredith Starbranch,[7] inherited property from Dr. McCarty, including a cottage, the Willows, and the property surrounding the Willows, the cottage lot. (Pls.' Ex. 3.) The Cedar Beach Road parcel first was purchased by Ms. Sturtevant and her husband, Roger Sturtevant in 1959. (Pls.' Ex. 4.) The Cedar Beach Road parcel

---

[2] Plaintiff Kevin Johnson was dismissed as a party.
[3] Plaintiffs begin the prescriptive period in 1957, when Dr. McCarty died. Defendants begin the period in 1959, when the property was transferred.
[4] Cedar Beach is also known as Robinhood Beach, Cedar Island Beach, and the big beach.
[5] The small beach is also known as the sandy beach, the children's beach, and Mary's Cove.
[6] Ms. Sturtevant died in 1996.
[7] At the time of trial, Ms. Starbranch was unwell and unable to testify.

2

was transferred to Ms. Sturtevant and Ms. Starbranch in 1961. (Pls.' Exs. 9; 10.) The Cedar Beach Road parcel was acquired by Richard and Phyllis Perry in 1982, and by Charles and Sally Abrahamson in 1998. (Pls.' Exs. 9; 19; 33.)

The Ridge property, which consisted of 2 ¾ acres, was part of the larger parcel inherited by Ms. Sturtevant and Ms. Starbranch. The Ridge property was reserved to them when they transferred other property in 1961. (Pls.' Exs. 3, 11, 13.)

The two parcels owned by Ms. Sturtevant and Ms. Starbranch were, therefore, acquired separately and were described separately. (Pls.' Exs. 3; 4; 9; 10; 11; 12; 13; 19.) Parcel I is the ridge property, which includes the small beach; parcel II is Cedar Beach Road. (Pls.' Ex. 5.) By 1962, Ms. Sturtevant and Ms. Starbranch owned both parcels I and II.

A 1947 survey commissioned by Dr. McCarty depicts the road as "Beach Road." (Pls.' Ex. 2.) A 1960 survey commissioned by Ms. Sturtevant and Ms. Starbranch depicts the road as "Beach Road (Private)" and shows a gate on the road. (Pls.' Ex. 5.)

On December 12, 1987, in compliance with the statute, Cedar Beach Road was posted to prevent the acquisition of a right-of-way over land owned by the Perrys and Gerald and Polly Clements. 14 M.R.S. § 812 (2013); (Pls.' Ex. 63.) The certificate separately described Cedar Beach Road as one of three parcels. At the time, the Perrys owned the road and the adjacent parcel. (Pls.' Exs. 19, 21, 63.)

---

· The Cedar Beach Road parcel consists of approximately .28 acres. Order on Mot. for Partial Summ. Judgment dated 5/1/14, p.5 n.4; (Pls.' Ex. 10 (1008 feet x 12 feet).)
· Defendants did not address in their post-trial brief the merger issue they raised previously. See Logan v. City of Biddeford, 2001 ME 84, ¶ 9, 772 A.2d 1183 (whether lots maintain separate character depends, in part, on the history of the parcels).

3



Six or nine months before trial, the Abrahamsons and Betsy Atkins of Gables Real Estate, LLC entered a purchase and sale agreement for the sale of Cedar Beach Road to Ms. Atkins. The agreement pertains only to the Cedar Beach Road parcel.

B. Witnesses

1. Martin Eisenstein

Martin Eisenstein has lived in Auburn for 30 years. He graduated from the University of Illinois in 1972 and the University of Illinois School of Law in 1975. He received a Masters in Law in 1976 in Stockholm, Sweden.

In 1987 or 1988, he did not live on Bailey's Island and was not a property owner but was told about Cedar Beach. He first visited Bailey's Island in 1987 or 1988 to use Cedar Beach and the small beach with 25 or 30 parents, school staff, and students from Auburn. None of them was a resident of or owned property in Harpswell. They parked on Robinhood Road and walked down Cedar Beach Road to the beach. At the time, Mr. Eisenstein did not know who owned the property and no one told him he was trespassing on anyone's property.

Mr. Eisenstein did not go to Cedar Beach between 1988 and 2004. In April or May 2004 he purchased property on Cedar Beach Road. Prior to 2004, Mr. Eisenstein was not told not to use Cedar Beach Road or either of the beaches. He never saw signs directing him not to use the road or the beaches.

After his purchase, he used Cedar Beach four or five times per year, usually with several other people from all over the world. Mr. Eisenstein did not recall seeing the Abrahamsons on the beach. There were always a number of people on the beach when he was there, speaking various languages, including French, German, Swedish, Norwegian, and the Bosnians' language.

4

On Labor Day 2011, Mr. Eisenstein noticed a net fence blockade that blocked access to the beach. There was no way to get around, over, or under the fence. After that date, Mr. Eisenstein used the Lester property to get to Cedar Beach. Previously, he may have seen a chain and two posts, three or four feet high at the other end of Cedar Beach Road near Robinhood Road. (Pls.' Ex. 71, 17.) The chain was always on the ground. Prior to Labor Day 2011, Mr. Eisenstein never saw a sign or notice with instructions not to use Cedar Beach Road or the beaches. No one ever told him or anyone in his presence not to use Cedar Beach Road or the beaches.

Mr. Eisenstein is a member, the secretary, the clerk, and the registered agent for plaintiff Cedar Beach/Cedar Island Supporters, Inc. (CBCIS). There were approximately ten incorporators of CBCIS in the summer of 2012. CBCIS has more than 300 members from many places, including 17 states, the District of Columbia, and a few foreign countries. Members must apply to the Board of Directors of CBCIS for membership. CBCIS does not represent the Town of Harpswell or the State of Maine. Mr. Eisenstein agreed that CBCIS and its members are not authorized to speak on behalf of the Town of Harpswell. One member of CBCIS, Kevin Johnson, is a selectman and initially was a plaintiff in the lawsuit but was dismissed.

CBCIS was formed because the members were concerned about the blockade and the denial of the public's right to access the beach. Mr. Eisenstein believed the public had a prescriptive easement. He determined CBCIS should speak to the Abrahamsons about the blockade. He understood that the Abrahamsons put up the blockade and they subsequently confirmed that belief.

5

In 2104, CBCIS settled a related lawsuit with the Aspatores, who own Cedar Beach.[10] (Pls.' Ex. 82.) CBCIS prosecuted this current lawsuit against the Abrahamsons, who own Cedar Beach Road, to protect and preserve continued access by the public to Cedar Beach.

CBCIS first approached the Town of Harpswell about initiating the lawsuit. The selectmen refused to bring the case for a number of reasons, including expense. Mr. Eisenstein did not recall that it was the Town's position that there was no public easement, but the selectmen determined the lawsuit would be too expensive. The Town was concerned about that expense and was risk-averse.

In 2011, the Town of Harpswell sent out questionnaires regarding the use of Cedar Beach Road to determine how to proceed and discussed public access over Cedar Beach Road to the beach. (Pls.' Ex. 81.) In 2013, after the lawsuit against the Abrahamsons was initiated but before the lawsuit against the Aspatores was initiated, the Town of Harpswell put on a warrant a bond in the amount of $220,000.00 to obtain easement rights over the Aspatore and Abrahamson properties either through negotiation and a transfer by deed or through a lawsuit and court order. The article passed overwhelmingly. (Pls.' Ex. 87.) The Board of Selectmen was unwilling to file a lawsuit and the article did not authorize the selectmen or the Town of Harpswell to join the lawsuit. This arrangement lapses in December 31, 2014 unless the Town of Harpswell renews the expiration date, which is permitted.

---

[10] There was a separate deed in 1996 from Goodwin Trust to the Aspatores with a reservation of rights in the deed from the Goodwins to the Aspatores.

6

### 2. Harry Starbranch, Jr.

Harry Starbranch, Jr. is an attorney who practices criminal law in New Hampshire. He was born in 1962 in Fort Worth, Texas. He lived in Alaska for two years, moved to Cape Neddick, Maine, and then to Cider Hill. The family of his mother, Ms. Starbranch, has lived in the York area since he could remember. His parents, Harry Starbranch, Sr. and Ms. Starbranch, divorced at some point.

His entire family visited Bailey Island with friends. They stayed in tents because there were no structures. Although he agreed there are two beaches, he confuses them. There was a beach on the property owned by his mother and grandmother, Ms. Sturtevant, which was the beach they always used and always talked about. He recalled three visits, from 1964 to 1970; if there were more visits, they were few in number. He has not returned to Bailey Island since 1970. He would not now be able to find Bailey Island on his own.

He recalled a chain three or four feet high across the road. The chain would have precluded a vehicle from proceeding down the road but a person could walk around the chain. He could not recall whether the chain was near the beach or the entry point to the road. The last thing his family did when leaving the property was to put the chain back up. When they returned, the chain was down. Mr. Starbranch, Jr. also recalled some sort of sign to deter trespassing but did not recall what the sign said. There were no other efforts he could recall to keep people off of the road.

Mr. Starbranch, Jr. recalled a stonewall that ran the length of Cedar Beach Road and a heavy forest behind the wall. On one occasion when he was six, seven, or eight years old, he sat on the wall with his brother and admonished people not to use the road. He did not know if he sat near the word "gate" on the

7

property survey. (Pls.' Ex. 5.) He did not know if he sat in the area depicted in photograph five in exhibit 89. (Pls.' Ex. 89, 5.) He did not know the people who approached. One person obeyed; two disregarded his instructions, took the chain down, and drove over the chain and down the road. He did not know where they went. The adults told his brother and him not to do that again because they would get hurt.

His mother deferred to his grandmother with regard to decisions about the property. His grandmother became very upset when people used the little beach. The maddest he ever saw his grandmother was when she spoke about Bailey Island.

Mr. Starbranch, Jr. never spoke to his grandmother about a 1962 posting of the property. He became aware of his mother's affidavit and Ms. Sturtevant's letter in the months prior to trial when the documents were provided by one of the attorneys. (Pls.' Ex. 55, 78, 79.) He did not recall seeing signs like those depicted in the photographs attached to his mother's affidavit. The 1962 posting was consistent with his belief about his mother and grandmother's general view with regard to people using the property. For the entire time they owned the property, neither his mother nor his grandmother gave any permission to use the road to get to the little beach or to use the little beach; there was no permission for the public to come and go. His mother and grandmother selectively gave permission to friends to go camping with the family.

He did not recall a ridge on his grandmother's property. He did not recall hearing people discuss the ridge property.

A fieldstone fireplace designed for a campsite was located near the small beach. People trespassed and used the property for parties, which involved

8

alcohol use and littering. The family was concerned about responsibility and was concerned that law enforcement was unresponsive to their concerns. Each time his family visited the property, the family was required to clean the property; they were never sure what they would find upon arrival.

In 1982, Mr. Starbranch, Jr. was willing to gather his college friends and close the road by parking pick-up trucks across the road. His grandmother was concerned for his safety and he never followed through with the plan.

His mother and grandmother eventually sold the property because of problems regarding use and concerns about liability. It was a rough crowd using the property and they had concerns about using the property themselves. His grandmother was also concerned about what would happen with the Bailey Island property if they lost the road; the concern was whether the property would be worth anything in that event. As long as they owned the property there was always the concern that they had lost control of the property and they realized they would not be able to return much longer. There was no discussion within his family, however, about filing a lawsuit to quiet title.

### 3. Harry Starbranch, Sr.

Harry Starbranch, Sr. has been an attorney for 51 or 52 years. In June 1957, he married Ms. Starbranch. He was in the Air Force and she was a student at Mt. Holyoke.

He believed his wife and mother-in-law inherited the property on Bailey Island in 1957. Ms. Sturtevant had very strong feelings about people not trespassing on the property and did not think the public had a right to cross the property. Mr. Starbranch, Sr. did not know why she felt that way. He recalled two beaches, one small and one larger. The large beach was not owned by his

9

wife and mother-in-law and they never went there. They were concerned about the public's use of the road. They did not give permission to the public to use the road to the beach based on that concern.

He did not know if there were other traveled ways to the beach. He stated they went down the drive, now called the "road," to the cottage and down to the small beach. They went down the road only and he did not know about any way other than the road.

He recalled a chain across the road but did not remember the height of the chain. He recalled also a couple of posts in 1960 at the entrance to the road where he marked "gate" on the map. (Pls.' Ex. 5.) Except for the chain, there was nothing restricting access to the road or the beach when he visited. There were no signs. He did not recall seeing anyone tell people to leave the road or the beaches. He did not recall seeing anyone use the large beach but he could not see the large beach from his mother-in-law and wife's property. His two boys used the small beach. He did not remember a fireplace on the beach, did not remember his son telling people not to use the road, and did not remember doing significant cleanup when they arrived at the property.

During the 1960 visit with his wife and in-laws, he put a padlock on the chain that was there because his wife, her mother, and her stepfather wanted to restrict access. The purpose of the chain was to keep people out. They also discussed that they wanted to post the road, although he could not recall who initially raised the issue of posting the road. They discussed posting the road at the beginning of the road, marked "gate" on the map. (Pls.' Ex. 5.) Ms. Sturtevant had researched the issue and discussed the legal requirements of posting the road. She was a trained physicist, very precise, a brilliant and very

10

capable woman, according to Mr. Starbranch, Sr. He described her as the nicest women he had ever met.

Mr. Starbranch, Sr. and his wife were in Maine before they moved to Fort Worth, Texas in June 1961. He was in the Air Force in Fort Worth and remained in Texas with his wife for the entirety of 1962. He prepared an affidavit for his wife's signature at her instruction. (Pls.' Ex. 78.) His wife, his wife's mother, and his wife's stepfather spoke to Mr. Starbranch, Sr. about the issue. The information in the affidavit for Ms. Starbranch's signature was transmitted to him by his wife from Ms. Sturtevant. Ms. Sturtevant did not ask Mr. Starbranch, Sr. to prepare an affidavit for her signature. The information included the two photographs; he did not know who took the photographs or whether he had the original photographs. The photographs were taken at the road. As far as he could tell, his wife and her mother were concerned about losing the right to have a private road.

Mr. Starbranch, Sr. added the "information and belief" language to the affidavit because the information had come from his mother-in-law. His wife had no personal knowledge of the contents of the affidavit. Mr. Starbranch, Sr. did not see the postings in 1962 because he was in Texas with his ex-wife. He was not aware that she posted anything.[11] He never saw any signs posted on the property.

---

[11] The affidavit provides, in part: "before me, the undersigned authority, on this day personally appeared MEREDITH KELLS STARBRANCH, who being by me duly sworn, declared to me: That in accordance with Chapter 174, Section 12 of the Revised Maine Statutes, she has posted two notices of her intention to prevent the acquisition of a right-of-way or other easement in or over her land in conspicuous places upon her land commonly known as the ""Ridge" property, that being the lot of approximately 2 3/4 acres on the eastern shore of Fresh Water Cove . . . that each of the two notices were posted for a period of SIX (6) successive days . . . ." (Pls.' Ex. 78.)

11

Mr. Starbranch, Sr. recalled he probably transferred the affidavit after his wife signed it but he could not remember how. Until this litigation, he last saw the affidavit when his wife signed it.

He was not aware of a ridge lot. A 1961 deed contains Mr. Starbranch, Sr.'s signature. He did not recall what the document was intended to do, did not recall who drafted the document, did not recall who directed him to sign it, and did not recall anything about it. (Pls.' Ex. 11.) He has no idea if he read the document before he signed it. Reading the document did not refresh his recollection regarding the ridge lot. Although there is a reference to the ridge property in his wife's affidavit, he did not know what that meant when he wrote the affidavit because the term ridge property does not mean anything to him. His wife and mother-in-law did not treat the property as two separate parcels.

He inserted the language about the ridge lot based on the instructions he received from Ms. Sturtevant and the metes and bounds language came from her as well. He had no memory of taking information from exhibit 78 and putting the information in exhibit 11.

He returned to the property in 1967 with his wife and two children. He never saw Bailey Island again after the 1967 trip. Bailey Island is not his favorite place in the world. He was divorced in the early 1970s. His ex-wife called him after their divorce with regard to the sale of the Bailey Island property.

### 4. Janet Baribeau

Janet Baribeau has lived in Brunswick, Maine since 1970. She grew up on Bailey Island and was familiar with Cedar Beach. Her family's history on Bailey Island has been continuous since her great-great grandparents. They used Cedar Beach every summer for swimming, for digging clams, and for family picnics.

12

She learned to swim at a young age at Cedar Beach. Her first memory was from age two in 1940 looking at crabs at low tide and playing with neighborhood children. Her family continued to use the beach every sunny day when she was a child and a teenager. They did not visit the beach often during winter but they did visit from spring to fall.

From her house, which was not far from Robinhood Road, she walked on the path, then Robinhood Road, and then Cedar Beach Road to the small and large beaches, which were considered one beach. Occasionally, she went to Fresh Water Cove and swam off the dock. She walked over the ridge property, which included a high physical ridge that ran along the side of Fresh Water Cove between the cove and Cedar Beach Road, referred to as the "ridge property." She followed the same path after joining Cedar Beach Road, a dirt road with mud puddles. (Pls.' Ex. 5.)

There were years in which cars were driven down Cedar Beach Road and parked in a field where the Aspatores' home is now located. At some point, cars were no longer driven down the road. There also was a chain just as one entered Cedar Beach Road from Robinhood Road. The chain was about three feet high and could be stepped over. People usually walked around the chain on a well-worn path. The chain was taken down at different times, put to one side, and put back. She recalled the chain was down more often than it was up. There were also two cedar posts, one on each side of the road.

Ms. Baribeau moved from Bailey Island to Brunswick but continued to use the beach. From 1959 through 1987 she used the beach as often as she could, probably six times during the summer. She was a busy mother of six children. She drove down the road and parked beyond where cars are allowed to park

13

now, just past the Robinhood Inn. The road was wider but granite slabs were put in on the side so parking is not possible now. She and others then walked to Cedar Beach with strollers and babies.

Ms. Baribeau recalled twenty-five people on Cedar Beach and twelve to fifteen people on the little beach on a nice day. Everyone made friends with everyone from the cottages; this was a favorite place to get together. There were people on the beaches from outside Harpswell as well, including motel guests using the beach; use of the beach was not limited to Harpswell residents.

Ms. Baribeau never asked permission to use either the beach or the road. No one ever told her she was not supposed to be there except during the past five or ten years. She was never asked to leave the beach or the road. She did not see a sign warning she could not use the beach or the road. In the 1960s, there might have been a sign on the fence stating "pedestrians only beyond this point," but she was not sure. She interpreted that sign to mean pedestrians were welcome. In 1962, Ms. Baribeau did not see any "no trespassing" posting on the road or near the beach.

Her previous use of the beach and the road changed just before or during Labor Day weekend 2011, when she was visiting Cedar Beach with her family. As they left the beach, she saw a barrier or blockade Mr. Abrahamson had built to stop people from going down the path that always had been used to access the beach. The Abrahamsons' lawn abuts the edge of the walkway. Mr. Abrahamson also put up a sign that stated Cedar Beach is a private beach.

Ms. Baribeau was upset he had put up a barrier because people had walked through the area for decades. She stated, "no one will ever stop me from using this beach." Mr. Abrahamson responded, "If you plan to come down here,

14

you'd better have hiking boots on." Although they could have walked around the barrier, they would not have done that.

Ms. Baribeau had never seen the Town of Harpswell or any public entity plow the road, regrade the road, put gravel on the road, trim the bushes, or maintain the road in any way. The Town of Harpswell police did not patrol Cedar Beach Road.

### 5. John Goodwin

John Goodwin was born in 1954. His family acquired property on Bailey Island in 1961, which included Cedar Beach. His family sold the property to the Aspatores. (Pls.' Ex. 71, 5/17.) His family rented in the area previously. They built a house at 48 Cedar Beach Road but never built on the property at the beach, now the Aspatore property.

Mr. Goodwin visited Cedar Beach as a child. His family built a camp in 1962 and they spent summers on the property until he was in high school, from which he graduated in 1972. In the 1960s during the summer, he was either at the beach, usually Cedar Beach but sometimes the small beach, or boating almost every nice day. During those years, the beach was not crowded and people on the beach were from the area or people renting in the area. On weekends, cars were parked along the road. He had summer jobs when he was old enough to work and went to the beach occasionally but not as often as when he was a child.

In the 1960s, he walked over the meandering path to Fresh Water Cove where his family kept an outhaul. Mr. Goodwin's father said he wrote to get permission from Ms. Sturtevant to use the path. They walked over the ledge to the hill and down to the cove.

15

There was a chain and two posts by Cedar Beach Road and Robinhood Road. There were metal posts on the edge of the road with metal rings for the chain. Mr. Goodwin's dad probably had a key because he owned property at the end of the road. It was common simply to step over the chain to walk down the road because the chain bowed down and was low enough to step over. There also were paths around each post to step around. His family was able to drive to their lot and other property owners drove down the road. People from the area walked down the road.

He had never seen anyone plow the road. Mr. Goodwin did not see any "no trespassing" signs and there was no limit on the public use of the road. Cars were parked from 1958 through 1987 on Cedar Beach Road. There is no room to park there now.

The beach was blocked off a few years ago on Labor Day. Mr. Goodwin thought Mr. Abrahamson blocked the beach but Mr. Goodwin did not see it being done.

### 6. Nancy Orr Johnson Jensen

Ms. Jenson was born in 1938 and grew up on Bailey Island. Her family owned a beach, which does not appear on the survey. They went to Cedar Beach most often but occasionally to the small beach. Her first memory is as a child going to the beach with friends. They had Sunday school picnics prior to the late 1950s. She did not know who owned the beach or the road. She never inquired about the owner and she never asked permission from anyone to use the beach or the road. She walked down the road to the beach and did not drive a car.

16

In the 1940s and 50s, people drove cars on Cedar Beach Road and parked in an open field, now the Aspatore property. From 1957 through 1987 the use of cars stopped and Ms. Jensen did not see cars parked in the area during that time.

A chain was put up on Cedar Beach Road, possibly in the 1960s. The chain was a heavier type of chain but low enough to allow people to step over it or walk around it. It was always the same chain, a heavier chain that sagged, attached to two posts. She was unable identify the post when shown a photograph. (Pls.' Ex. 69, 0022.) The chain was mostly up; she did not recall seeing it down. She remembered noticing that the chain was gone. She interpreted the chain as designed to keep cars off the road. During the period from 1957 through 1987, there was a sign on the right-hand side of the chain. She could not remember exactly what the sign said.

Ms. Jensen visited the beach one or two times per week before she moved to Brunswick in 1960 and less frequently after she moved. There were approximately twenty people on the beach during these visits. People from outside Bailey Island, people from Brunswick, and people who did not own property in Harpswell used the beach.

Beginning in 1960, Ms. Jensen taught second and fourth grade in Brunswick for two years. In 1962, she taught in Germany in the military and next moved to Illinois. She returned to Maine for two to four weeks in the summer and went to the beach during those visits one or two times per week. The number of people on the beaches during those summer visits remained consistent. She sometimes visited the beach at night because there were no crowds. That frequency of visits to the beach continues to this day.

17

Through 1987, Ms. Jensen was never told not to use the road and never asked permission to use the road. During the past two or three years, Mr. Abrahamson erected a substantial blockade to the beaches. He said he was blocking the beach. Ms. Jensen and her friend said they would continue to use the beach and pass the blockade. Mr. Abrahamson replied that he didn't think they would because the blockade would be substantial and they would have to have big boots on to go around it. She returned to the beach later and the blockade had been taken down but she did not recall when. That was the first and only time she had been told she could not use the road or the beach.

She never saw the Town of Harpswell work on the road, grade the road, maintain the road, plow the road, or post a speed limit on the road.

### 7. Marilean Johnson

Marilean (Pam) Johnson is 82 years old and has lived on Bailey Island for 80 years. She lived in Florida from 1953 to 1955.

Her first memory is going to Cedar Beach at age three or four years. She has seen pictures of herself and her mother at the beach. They always went to the big beach and not to the little beach unless to chase a child who ran away.

At the beginning of her use, Dr. McCarty owned the road and the beach. She knew him very well and he supported people using the beach. He closed the beach one day and charged one dollar as a fundraiser for the Boy Scouts.

When she was much younger, people drove to the beach and parked on the Goodwin property. There was always a chain on the road, even when Dr. McCarty owned the property. Because there had been a fire, which may have been caused by a car, Dr. McCarty did not want cars on the road but he welcomed people using the road. She could step over the chain, but normally,

18

she went around the chain on a path to the left. The chain was always up during Dr. McCarty's ownership to deter cars.

From the late 1950s to 1987 she did not remember a change in the use of the chain. Signs began to go up three or four years ago.

She has visited the beach continuously every year beginning in the spring, throughout the summer, definitely in the fall, and once or twice during the winter. From her house, she walked to the beach on Robinhood Road and Cedar Beach Road. She raised four children on the big beach, from 9:00 a.m. to 4:00 p.m., at least five days per week all summer when her children were growing up. The first was born in 1955 and the last was born in 1969. She stopped going to the beach two years ago.

While at the beach, she relaxed while the children swam. She taught the children to swim at the beach. She had many friends there, who met at the beach to socialize. On a nice day there would be thirty-five people at the big beach and perhaps ten or twelve at the little beach. There were people there she did not recognize, although not many. She worked at the Bailey Island Motel, which sent people to the beach.

No one gave her express permission to use the road and she never asked permission to use the beach or the road because she never thought she needed to. She never saw a "no trespassing" sign or a sign stating passage was strictly forbidden. Because there were no signs that said, "don't come," she went. Except during the past five years, no one ever told her she could not use the beach or the road and no one ever said to leave the beach or the road.

19

There was a short cut from Fresh Water Cove to the Cedar Beach Road across the ridge. She and others used the short cut. The ridge was opposite Judge Haines's house. (Pls.' Ex. 71, 17.)

### 8. Robert Jackson

Mr. Jackson was born June 13, 1939. His parents first purchased a cottage on Bailey Island on Oceanside Road in 1947, which was when he first visited Bailey Island. Cedar Beach Road begins at Oceanside Road. (Pls.' Ex. 71, 17.) He followed Cedar Beach Road to get to Cedar Beach; that was the only way to get to Cedar Beach by land. His family still owns a cottage and abutting property.

In 1947, he went to both beaches with members of his family. In 1948, he pulled his younger brother in a wagon to the beach. They continued to go to the beach frequently into the 1960s. Although it varied due to weather, there would be twenty-five or thirty people on the beaches in August.

When his family purchased the cottage in 1947, his family lived in Massachusetts. The family lived in Massachusetts for approximately four years before moving to Cape Elizabeth, Maine. He returned to the beaches each summer after 1947 with family, friends, and relatives. He brought friends from Newton, Massachusetts and Winchester, Massachusetts to use the beach. They used the beach very often, although perhaps not daily, but it was "the place to be." There was a mix of people using the beach, including people renting cottages, people who lived on the island, and others he did not know. He made friends with people there, especially those with children.

Mr. Jackson used the beach consistently with his family and friends until he left for college. The number of people using the beach remained consistent but

on good days and holidays, attendance was higher than usual. He very, very rarely saw cars traveling down Cedar Beach Road.

During summers, he worked as a sternman on a lobster boat, mossed, and worked at a fish laboratory. He became familiar with people from the Bailey Island community and their children. He attended Dartmouth College from 1957 to 1961. During college, he spent summers on Bailey Island. Except for two six-week military summer camps, he was on Bailey Island at the beach. He noticed no significant change in the number and mix of people on the beach.

After college, he went to officer's basic training at Fort Sill in Oklahoma. He then went to Bailey Island for a short period of time, then to Fort Dix, and then to Germany until June 1963. He immediately left for graduate school at Rutgers in New Jersey until the summer of 1964, when he received a M.B.A. He returned to Bailey Island or Cape Elizabeth depending on the time of year.

He was married in 1959 and the first of his three children was born in 1960. In 1960 his family stayed at Bailey Island while he was at summer camp and in the military. When he was in college, his wife and children spent a significant part of the summer on Bailey Island. In 1961 they joined him in Germany until 1962. When they were in New Jersey, his wife and daughter went to Bailey Island independently of him; he was at the beach less frequently than his family. Over the years, there was no difference with regard to the number and mix of people at the beach.

He spent one and one-half years in New York City at Haskins & Sells, a CPA firm, and then moved to Hopkinton, Massachusetts, where he and his family remained until 1969. He and his family consistently made return trips to Bailey Island each year and used the beach on each trip.

He purchased a cottage on Bailey Island in 1960 abutting the property of his parents. He and his family continued to use the beach frequently to swim, skip rocks, clam, and fish. The number of people using the beach remained consistent and included people from the area and from away.

His family next moved to Amsterdam, New York, where he worked for a different company for three years. The family continued to go to Bailey Island for the summer. Although his family went to the beach more often than he did, he continued to go down Cedar Beach Road to the beach. He and his family then lived in Granby, Connecticut for three years while he worked for Connecticut General. They continued the same pattern of traveling to Bailey Island and the beaches. Nothing changed with regard to the number or mix of people at the beach. The only change concerned houses that were being built on the road from Robinhood Inn to the beach. A log cabin had been constructed on the Haines property in the 1940s. (Pls.' Ex. 71, 5.)

He and his family moved next to Liverpool, New York for one year and continued to visit Bailey Island in the summer with the same frequency. The family then lived in Monmouth, Maine for nine years and Mr. Jackson worked for a textile business. He left in 1983 and eventually opened his own accounting practice. Visits to Cedar Beach increased during their residence in Monmouth. They were there every week or every other week; his family visited more frequently than he did. In 1983, the number of people and mix of people at the beach remained consistent.

In 1983, Mr. Jackson and his family moved to Cundy's Harbor, where they continue to live. They continued to use the beach through 1987. He went to Bailey Island on weekends with his family and brother; his family may have

22

been there for longer periods. More people had moved to Bailey Island and summer homes had become winter homes but the number and mix of people at the beach remained consistent. It was a "youngster's beach" as opposed to one for retirees.

He did not remember the exact frequency of their use of the beach. His children were more beach oriented in the 1970s than in the 1980s. During the New York/Massachusetts/New York City time, he had fewer visits to the beach because of the distance involved.

There is a higher elevation ridge with solid rock outcroppings west of Cedar Beach Road. (Pls.' Ex. 69, 0057; Ex. 71, 17 (gray and olive green area).) The ridge area is a higher elevation than Cedar Beach Road. East of Cedar Beach Road is a fairly even elevation.

Mr. Jackson saw a chain across the road in several places over many years. He saw a chain where the orange and black portions of Cedar Beach Road join on the map. (Pls.' Ex. 71, 17.) The chain was in various locations along the road but the locations were within 25 feet of each other. The chain was a low height, about as high as a car bumper, and the chain drooped in the middle. A person could step over the chain, which was frequently done, and sometimes the chain was removed. When it was up, he would step over it or go around it. He did not see a sign near the chain, and during the various years he discussed in his testimony, he never saw "no trespassing" or "private property" signs.

The post depicted in photograph 20 in exhibit 69 was similar to the post that was there. (Pls.' Ex. 69, 0020.) The same type of post was not used in all the locations. He recognized the post depicted in photograph 22 in exhibit 69 because he saw it during the view of the property taken with counsel and the

23

judge. (Pls.' Ex. 69, 0022.) The post was located on the left side of the road as they approached the beach, a good distance from the first set of posts at the head of the road. He was sure it had been there a long time but did not know the beginning date. Although wooden posts were used, the chain was either connected to the trees or to two wooden posts. (Pls.' Ex. 69, 0025.) He remembered cement, granite, and metal posts.

Mr. Jackson never saw a sign on Cedar Beach Road or the beaches that looked like those depicted in the photos included in exhibit 78. (Pls.' Ex. 78, 2.) Mr. Jackson concluded that the photos depict high ground behind the sign and there is no high ground in the area where Cedar Beach Road joins Robinhood Road. The ground is lower in that area. He noted further that the signs do not identify what is being closed or protected.

Mr. Jackson never asked for permission to use Cedar Beach Road or the two beaches because he did not think that was necessary. He believed it was a public area and someone maintained it. There were no houses toward the end of the road until much later.

In September 2011, Mr. Abrahamson placed a fence across the bottom of the road at the opposite end of where the chains had been placed and near the Abrahamsons' property before the beach on the orange area beside the yellow area on the map. (Pls.' Ex. 71, 17.) Mr. Jackson was not sure what the fence meant. He knew Mr. Abrahamson had attempted to sell his property and believed the fence had something to do with that. The fence was definitely a physical barrier. He continued to use the beach by walking around the fence and using the Lester property with permission.

24

### 9. Jackie Merrill

Jackie Merrill has lived on Bailey Island all her life and is familiar with Cedar Beach. She currently lives in her grandmother's house on the island. Her mother taught her to swim at Cedar Beach and she has photos of herself there when she was an infant in the early 1950s. As a child and teenager she used the beach two or three times per year at least. It was a special occasion to go there.

She took her own children every sunny day during the summer to Cedar Beach, which she called the "best playground in the world." They might take a walk on the beach in the fall and winter just for the quiet nature of the beach. She used the beach until approximately three years ago, when the sign asked her not to go there and she stopped going.

She recognized most people on the beach as island residents or summer visitors. Some she did not recognize and assumed they were from away.

She recalled a chain at the beginning of Cedar Beach Road where the orange Cedar Beach Road meets the black Cedar Beach Road on the map. (Pls.' Ex. 71, 17.) On occasion, the chain was down but not often. She always walked to Cedar Beach pushing carriages or pulling wagons. There was always a path to take around the side of the chain or she could step over the chain. Before 1987, she had never seen a "no trespassing" or "private property" sign on the road. She lived on Bailey Island in September 1962 and used the beach during that time.

She remembered a rusty post on either side of the road in the early 1970s. Photograph 20 in exhibit 69 did not depict the post she saw. (Pls.' Ex. 69, 0020.) She could not recall if photograph 22 depicted the post she saw. (Pls.' Ex. 69, 0022.) She did not remember a chain between two trees or wooden posts.

25

She is very familiar with the ridge property in this area and spent time on the ridge in order to get away from her parents. The ridge is located on the Elizabeth Parks and Campbell properties. (Pls.' Ex 71, 17.) She walked from Fresh Water Cove shore up over the ridge, across the Abrahamsons' property, which was a field, to the beach. In the early 1970s, there were no houses on the ridge property and none on the Abrahamson and Campbell properties. There were houses on the Haines and Lester properties. (Pls.' Ex. 71, 17.)

Ms. Merrill never asked permission to get to the beach or to use Cedar Beach Road. It was a tradition and she did not think that she needed permission. She was never told not to use the road or the beach. Although people accessed the beach from the ridge or by boat, most of the time people used Cedar Beach Road to get to the beach.

Because of the chain, she concluded that the owners of the property did not want vehicle traffic. Her forefathers had gone down the road and she believed it was okay to go down Cedar Beach Road. She had never seen the Town of Harpswell maintain Cedar Beach Road between Robinhood Road and the beach and there were no speed limit signs. She did see police presence on one occasion but could not recall when and did not know what the police were doing.

### 10. Peter Hill

Peter Hill was born in 1926 in Concord, Massachusetts. His grandmother bought a cottage, The Nautilus, on Bailey Island in 1928. His dad built a cottage adjacent to Mr. Hill's grandmother's cottage in 1933 and Mr. Hill has summered there ever since. His brother bought a cottage, The Seashell, next to his grandmother's cottage in the 1960s or 1970s. The three cottages are still owned

by his family members. His sister acquired the property at Mackerel Cove and his niece acquired the Adams cottage, which is next to his house.

He is familiar with Cedar Beach Road, which he used to access the two beaches. At the end of Cedar Beach Road, he crossed the ledge on the Aspatore property to get to the main beach. He frequented the big beach more than the small beach but used the small beach from time to time. His earliest memory of going down Cedar Beach Road to the beach was from the 1930s. He did not always recognize the people on the beach when he visited as a child.

Until 1952, he lived in Concord, Massachusetts. He then moved to Washington D.C., where he was a reporter for the Washington Post for one year. In the spring of 1954, he finished his master's degree at Boston University and for two years taught in Meriden, New Hampshire. From 1956 until 2005, he lived in Washington D.C. where he obtained a Ph.D. and taught at George Washington.

He went to the beach from age four until the time of trial and always accessed the beach by Cedar Beach Road. After his son was born in 1953 or 1954, his family visited the beach more than once during the summer and brought guests and other people on the island to the beach. As an adult he used the beach from August until early September. From 1960 through 1987 he was on Bailey Island in August and visited the beach perhaps one time during August. It was a tradition to go to Robinhood Beach.

On a good day a dozen or more people would be on the big beach. He did not really notice the small beach. He recalled a sign on Cedar Beach Road or the beaches. Although he stated first the sign said, "do not trespass" or "private property," his best recollection was the sign said, "no parking" because parking was always a problem. No one ever told him not to use the beach or the road.

27

He recalled a knee-high chain across the road. He walked around or possibly stepped over it because it was low enough to step over. The sign might have been on the chain but he could not recall. He did not have a clear recollection of the posts to which the chain was attached. (Pls.' Ex. 69, 0020, 0022.)

In 2013, he went to the beach to see if he could get yelled at; he was not. He noticed many more buildings in the area. He never saw the Town of Harpswell maintain Cedar Beach Road and he did not maintain it.

### 11. Gale Jackson

Gale Jackson is one of Robert Jackson's three children. She is familiar with Cedar Beach and the small beach. She was born in 1966 and recalls visiting the beaches first when she was four to six years of age, the early 1970s. Her use continued through 1987. As a child, she used the small beach because her parents were concerned about the tidal pools at Cedar Beach and about being unable to return from the island during high tide.

She visited both beaches by walking down Cedar Beach Road, which was the only way to get to the beaches by land. In the early 1970s, she visited the beach every other day. Later in the 1970s and 1980s, she visited the beach every day for the three months spent on Bailey Island.

She went to the beaches with her parents, sisters, and friends from places other than Bailey Island and Maine. People renting on the island used the beach. On a good, bright, sunny day, there could be forty or fifty people at the beaches. The number did not decline over the years. She worked at Cook's Lobster House and noticed customers from the restaurant at the beach. She also recommended the beaches when asked where to go by people from away.

28

She recalled a chain, which varied from time to time, in the area where the orange Cedar Beach Road joins the black Cedar Beach Road. (Pls.' Ex. 71, 17.) The chain was attached to a post and a three-foot high metal pole. The chain was approximately one foot off the ground. She did not know if the righthand post was made out of granite as depicted in photograph 20. (Pls.' Ex. 69, 0020.) The metal post was not as depicted in photograph 22. (Pls.' Ex. 69, 0022.) The metal post was just a green pipe. There was a path to the left of the chain; she and others stepped over the chain.

Through 1987, she was never told not to use the road or the beach. She never asked for permission to use the road or the beach.

### 12. James Hays

James Hays was born in 1948 in Portland, Maine. He grew up in Cape Elizabeth and Cumberland through high school. He then joined the Army and was stationed in New Jersey and Germany. He returned from Germany in 1971. After his return, he lived in Portland and Freeport.

His grandparents lived on Bailey Island and he spent summers with them. His first memory of using the beach was at age twelve in 1960. He became very familiar with the entire island, including the beaches and Cedar Beach Road. He used the beach to age fifteen sporadically, perhaps five times per summer, with friends and family. In the 1970s and 1980s, he rarely used the beach. His wife took his sons to the beach.

He vaguely recalled a one-foot high chain attached to a round pipe on Cedar Beach Road during the early 1960s in the area where the black Cedar Beach Road joins the orange Cedar beach Road on the map. (Pls.' Ex. 71, 17.) There was a path to the left side, which he used to walk around the chain.

29

He believed the post depicted in photograph 20 was installed during the past ten years. (Pls.' Ex. 69, 0020.) He did not recognize the post depicted in photograph 22. (Pls.' Ex. 69, 0022.)

### 13. Wendy Lefavor

Wendy Lefavor lives on Orrs Island and grew up on Bailey Island on Fowler Road by Cedar Beach. She is very familiar with Cedar Beach and Cedar Beach Road. She walked down Robinhood Road to Cedar Beach Road to get to Cedar Beach. On occasion, she used the small beach as well.

She was born in 1960. Her mother took her to Cedar Beach when she was one or two years of age. During the 1960s, 1970s, and 1980s she used the beach five days per week, if not six. The beach was the entertainment in the summer. On a nice summer day, she saw sixty or seventy or more people on both beaches. Most were from the island but there were also people she did not recognize. In the winter, she walked on the beach two or three days per week. She continued to use the beach until people could no longer go there.

She was familiar with a ridge in the middle of the Campbell property. (Pls.' Ex. 71, 17.) She recalled a one-foot high chain across Cedar Beach Road at the front of the road where Cedar Beach Road meets Robinhood Road. The chain was very low and people could either walk across or around it. Sometimes, the chain was on the ground. The chain was attached to the post depicted in photograph 22. (Pls.' Ex. 69, 0022.)

She never saw any signs during the 1960s, 1970s, or 1980s on Cedar Beach Road or on the beach. She never asked permission to use the beach or the road. She did not know who owned the beach and never spoke with the owners.

30

## 14. Charles Abrahamson

Charles Abrahamson bought his property in 1998 from Richard and Phyllis Perry. (Pls.' Ex. 33.) He paid $420,000 for the property. There was some construction when he bought the property and he added the main house in 1999.

The Perry/Abrahamson deed references two parcels. Mr. Abrahamson and his wife placed the property in the family trust. (Pls.' Ex. 36.) That deed references both parcels. (Pls.' Ex. 36.) Other deeds show transfers of the property in and out of the trust and reference the same two parcels. (Pls.' Exs. 43, 44.)

Parcel I in his deed includes the bright yellow property that appears on the map. Parcel II in his deed includes the orange Cedar Beach Road that appears on the map. (Pls.' Ex. 71, 17; 33.) Mr. Abrahamson believed he was purchasing one piece of property from Robinhood Road down to the main property where the house is located. At the time of the purchase, Mr. Abrahamson believed he could close the road to the public based on advice from the realtor but had no intention of closing the road at that time.

His deed includes a description of the road. Dr. McCarty sent a plan to the Town of Harpswell when he built the road in 1947. (Pls.' Ex. 2.) Mr. Abrahamson believes the road is probably wider in some places and narrower in others than shown on that plan. The 1,000-foot length and 12-foot width is roughly accurate. The 1947 plan depicts an earlier version of what has become Cedar Beach Road. The Sturtevant/Starbranch plan is very similar. (Pls.' Ex. 5.) He never met either woman but he has seen their names. Cedar Beach Road starts approximately at the triangle. (Pls.' Ex. 5.)

31

Mr. Abrahamson had a "Notice to Prevent Acquisition of Right of Way and/or Easement by Adverse Possession" prepared. (Pls.' Ex. 64.) The notice is dated 1999. He read the notice, believed it was accurate, and signed it. In the notice, parcel I corresponds to the yellow property on the map and parcel II corresponds to the road with the same description used in the various deeds. Parcels I and II overlap physically and have been surveyed that way. The yellow property overlaps into the road by six feet and the road narrows.

A copy of the notice was posted by a deputy sheriff in a conspicuous place on each parcel for six successive days beginning June 18, 1999. The notice was also filed in the registry of deeds. (Pls.' Ex. 64.)

In 2001, Mr. Abrahamson requested a twenty percent abatement of his property taxes based on his allowing access across his property to the beaches. (Pls.' Ex. 65.) In his request, he noted that on occasion, there have been more than 250 people on the two beaches. Mr. Abrahamson believed the public use of Cedar Beach Road to the beaches adversely affected the value of his property. He did not recall whether he had an appraisal done when he purchased his property and did not know whether his purchase price reflected the use by the public.

He noted also in the abatement request that cars blocked the entrance of Cedar Beach Road at the point where the black road joins the orange road on the map. (Pls.' Ex. 71, 17.) Cars were also parked on the black "U-shaped" area on the map. (Pls.' Ex. 71, 17.) People were not able to go down Cragmoor Lane and emergency vehicles could not get around the curve on Robinhood Road. It became apparent also that trash was accumulating. Mr. Abrahamson's abatement request was denied.

In 2008, Mr. Abrahamson and his wife, Sally Abrahamson, prepared an affidavit. (Pls.' Ex. 66.) He read the affidavit carefully before he signed it and the affidavit was accurate to the best of his knowledge, except for paragraph 6(b). Mr. Abrahamson intended to list those who had a deeded right-of-way over the entire length of Cedar Beach Road. At the time the affidavit was signed, Terry MacGillivray had a right-of-way down the road; the question was how he would get from the road to the water. Mr. MacGillivray owned the Robinhood Inn, which is now a private home. The property is located near the U-shaped road on the map. (Pls.' Ex. 71, 17.)

The Aspatores have a one-foot right-of-way on the side of the road to access the rest of their property. It seemed to Mr. Abrahamson they should have a right-of-way all the way to the end of the road so he included them. The deed may not support that conclusion. The Gables Real Estate/Betsy Atkins property does not have an easement to the end of the road. That easement ends where the Gables/Atkins property touches Cedar Beach Road.

In the past, Mr. Abrahamson welcomed the public's use of Cedar Beach and Cedar Beach Road. He sold ice cream to people on the beach a few times per week. On Labor Day 2011, he physically blocked access to the beaches. He had decided enough is enough.

Mr. Abrahamson has maintained the road since he purchased the property. A few residents on the road have helped him on their own volition, including John Campbell, Joan Lester, and the Aspatores. The Town of Harpswell does not plow, grade, or police the road or parking, and does not post speed limits. Mr. Abrahamson does not allow parking on Cedar Beach Road.

33

None of the witnesses who testified has helped maintain the road since he owned it, except Ms. Lester.

Since Mr. Abrahamson has owned the property, the public has come down the road and the public used the little beach as well. Once every few years tourists drove down the road out of curiosity. Mr. Abrahamson requested they not drive on the road, and, in most cases, they simply left. People have asked if they could bring a person in a car down the road, such as a relative who could not walk to the beach, and Mr. Abrahamson allowed that. He also allowed neighbors to drive down the road. He could not say no one has ever asked permission but, by and large, people just walk down the road.

He previously favored public access to his land. He told people he started hunting with this dad when he was ten years old. They did not have the privilege of hunting on their own land and always hunted on someone else's land. Mr. Abrahamson felt that allowing people to use his road was his way of saying thanks.

The economy changed and the Abrahamsons felt they might have to do something different. There was a change in people's attitude. Use of the road and the beaches was no longer viewed as a privilege; the use was an entitlement. It was as if it was the people's beach and they could do what they wanted.

The Abrahamsons were frustrated. They negotiated with the Town of Harpswell and the land trust. The Abrahamsons finally closed the little beach. Because no one listened to them, they closed the road seven or eight feet before the end of the road.

The Abrahamsons have suffered retaliation as a result of closing the road. They have received hate mail, phone calls, and anti-Semitic mail. This response

was hurtful to them; they considered this the thanks they were given for what they had done for the past ten or twelve years.

### 15. Janice Skillings-Goff

Janice Skillings-Goff was born in 1952 in Bath and lived on Bailey Island. Nine generations of her family have lived in the same spot on Bailey Island. She described the Bailey Island community as tight-knit; word gets out as to what happens on the island. Generations of families have lived there. The number of Bailey Island residents is fairly stable but there may be fewer now. During winter there are fewer than 1,000 people.

She is familiar with the Cedar Beach area and the road. Her earliest recollection of using the beaches was when she was three years old with her mother. She remembers that instance because as the youngest of four children, she was rarely alone with her mother. She has used the beach since then to the day of her testimony. She consistently used both beaches but she prefers the larger one. She has been at the beaches every year of her life since she was three.

She uses Cedar Beach Road to get to the beach; there is no other route by land. She has arrived at the beaches by boat as well. During her entire childhood and her teens and twenties, she used the beach often for swimming and walking from spring to fall and after school when school was in session. She swims very early in the year until October.

To age eight, she used the beach a few times per summer. From age eight, she would meet friends and walk to the beach five days per week. This continued until she was fourteen, when she began working summers and used the beach on her days off and evenings. Her use continued through September into October.

She had already been swimming at the beach at the time of trial. As long she can tolerate the water, she goes in as early as April but definitely by May.

During the time period before she was twelve, she never saw a sign on Cedar Beach Road or the beaches that said, "no trespassing," "keep out," or words to that effect. No one said she could not use the road or the beaches.

She worked during the summers in high school and beyond and took a year off to travel in Europe. She graduated from high school in 1971 and went to Europe from fall 1971 until June 1972. She then returned to Bailey Island to work and live with her family.

She went to college at the University of Maine and graduated in 1977. When she was in college, she lived at home, worked, and used the beach on her days off during the summers. She always returned to see her mother on her days off and that continued into her twenties.

She started law school in 1980 and interrupted her studies to move to Oregon. When she was in Oregon, she spent summers in Maine. During one summer, she rented a cottage and during another, she stayed in her husband's family home on Great Island. She used the beaches during her free time, whenever she could, and every day if she worked in the mornings.

She worked on occasion at Bailey Island restaurants and a motel. She sent guests to the beach and explained where the beach was. The motels and restaurants always sent people to the beaches. The directions to the beach were given to out-of-staters and people from away.

Through the end of 1987, she walked down Cedar Beach Road with friends and family and invited people from other places to go to the beach. She saw other people walking down the road to the beach. She never saw "no

trespassing" or "keep out" signs or signs with words to that effect through the end of 1987. In the late 1970s or early 1980s, she saw a sign that read, "no cars." Cars had been driven down the road and parked at the end of the road. There was some grumbling about the prohibition but the area was so crowded with cars residents could not get out of their driveways.

She had never seen signs on Cedar Beach Road like those depicted in the photographs attached to the Meredith Starbranch affidavit. (Pls.' Ex. 78.) If there had been such signs, there would have been public outrage. Further, Ms. Skillings-Goff's mother would have known about it and there would have been issues in the family about whether Ms. Skillings-Goff could use the beach thereafter.

During Ms. Skillings-Goff's twenties, a chain was located at the very beginning of the road near the turn. At first it was a rope and then a more substantial chain. A lobster clasp at the end of the chain was clipped to a ring on a post. The chain was down on the ground frequently. The chain was perhaps a couple of feet high but low enough to step over; people could walk around the chain on either side or step over it. It is possible there was a chain or rope in the 1960s but she did not recall seeing that.

The posts depicted in photographs 21 and 23 were not the post she saw. (Pls.' Ex. 69, 0021, 0023.) The post in photograph 21 was in the woods somewhere and not on the road. Further, the post she saw was not that substantial.

Everyone used the road to access the beaches. It was a common occurrence for people to walk down the road and engage in recreational activities on the beaches.

37

Ms. Skillings-Goff never asked permission to use the road or the beaches. She always thought they were privately owned by some people who owned property in the area and thought more than one family owned them. She nonetheless used the road without permission, as everyone did.

In 2013, the number of people at the beach declined because of the controversy about the entrance to the beach on the Abrahamson property. Mrs. Lester let her friends cross because access was denied on the Abrahamson property but people were still at the beach. She believed last summer there was a barrier across the end of the property.

She is a lawyer and practiced in Boston and Salem, Massachusetts beginning in 1986. In 2013, she left her law firm and started her own practice. She is married with one daughter who is nineteen and attends Harvard. She has taken her daughter to the beach since she was born. Last summer was the last time she visited the beach with her daughter. Ms. Skillings-Goff now lives in Brunswick but goes to the beaches on the weekends.

### 16. Betsy Atkins

Betsy Atkins owns Gables Real Estate, LLC. Ms. Atkins did not know the precise date Gables Real Estate, LLC was formed. Gables owns other properties, including property in Coral Gables, on which the company name is based. She spends five months on her property in Maine, arriving in May and leaving the last half of October.

The Gables/Atkins property abuts Cedar Beach Road for 94 feet. (Pls.' Ex. 71, 17; 39-41.) Ms. Atkins removed a structure on the property and built a home on the property ten years ago. Cragmoor Lane leads to her driveway. (Pls.' Ex. 69, 0011.) Her driveway connects with Cedar Beach Road but that connection is

38

not shown on the map. (Pls.' Ex. 71, 17.) She does not use the orange part of Cedar Beach Road for transportation. (Pls.' Ex, 71, 17.) She does walk the road regularly to the beaches for exercise. Sometimes she is accompanied with friends or family and sometimes she is alone.

Her next-door neighbor, Wallace Millner, put up the sign shown in photograph 11. (Pls.' Ex. 69, 0011.) He bought his property from her approximately six or seven years ago. (Pls.' Ex. 42.) Her property has an easement on Cedar Beach Road. She was asked whether the easement extended for the entirety of the road and her response was, "I don't know the technicalities of how easements work." She then stated she knew what an easement is but did not know if it entitled her to go to the end of the road or just to access her property.

She has walked to the end of Cedar Beach Road and she goes to the beaches, as recently as the day before her testimony. At her request, the Abrahamsons gave her permission to do so. She has asked for such permission many times over the past ten years.

There is a current agreement between her and the Abrahamsons to buy the orange part of Cedar Beach Road. (Pls.' Ex. 71, 17.) She testified, "I do not recall the precise price. I think we have the purchase and sale, we can put it in evidence, but I don't remember the precise price." The agreement involves the purchase of Cedar Beach Road only. She approached the Abrahamsons about the purchase six to nine months before trial but she did not remember precisely. Because there is a purchase and sale to her, she "presumes" the sale is to her and the Abrahamsons are prohibited from selling to anyone else but stated, "I do not

39

know all the nuances of contract law." At the time of trial, the sale was in process and the bank was to issue a final approval to release its mortgage.

Gables intervened in this lawsuit to protect its property as it may be impacted by a public prescriptive easement. Ms. Atkins stated the road is currently a private road and she seeks to maintain it as a private road. If the public obtains an easement, she believes there will be significantly more traffic, rubbish, garbage, diapers, cans and bottles, toilet paper, and debris. People wander down the road, walk into her yard, and allow their pets to walk into her yard. She is impacted by noise as well. She hopes to do all she can to keep the road private.

Ms. Atkins prepared an email that outlines problems, concerns, and objections with regard to Cedar Beach Road becoming a public road. She is concerned about litter because she finds toilet paper, tissues, and excrement, which she assumes is human because toilet paper is involved. She spends an hour or so weekly picking up trash and cleaning up in the area near her fence on the western end of her property by the road. She erected a gate and fence in that area at the end of summer 2013. (Pls.' Exs. 69, 0027-0029; 89, 6.) The gate is sixteen feet, which includes two doors and a fence on the sidelines to support the gate. She uses the gate to access her property one or two times per week. She installed the gate to keep people and dogs off her property, to conceal mulch and woodchips for her extensive gardens, and for privacy. (Pls.' Exs. 69, 0030; 89, 6; Def. Gables Real Estate LLC's Ex. 93.) Whether the gate and fence had solved the trash problem remained to be seen because few people are in the area during the winter.

Although she has recording security cameras on her property, she has never examined the recordings to see if anyone engaged in unseemly activity on her property. She has three dogs, which she walks on leashes but if other dogs enter her yard, her dogs run off.

She is also concerned that Robinhood Road is blocked with cars, which would obstruct passage of an ambulance, fire truck, and other vehicles. She was not aware that passage on Cedar Beach Road was blocked.

She agreed the ground is elevated as one approaches the Campbell property on Cedar Beach Road en route to the beach. (Pls.' Ex. 71, 17.) The Campbell home sits up a bit and has sloping terrain behind it.

### 17. Kevin Johnson

Kevin Johnson has lived in Harpswell for twenty-eight years. He was born in 1955 in Florida but his family moved to Bailey Island immediately after his birth. Several generations in his family, back to the early 1700s, have lived on Bailey Island. His grandmother's house is located on Robinhood Road, six hundred feet up the hill. He lived there beginning at the age of four. He still lives and works on Bailey Island.

His first memory of the beaches predates 1960. His sisters were born in 1957 and 1960; his brother was born in 1969. His family and neighborhood kids packed their beach items and walked to the beach along Cedar Beach Road, the only land route to the beaches. He continued to use the beach for the next several years very frequently. He was a caretaker for cottages on the island. People also drove down Cedar Beach Road and parked. He had permission to do so from the family who owned property down the road.

41

He was in the Army from 1973 to late 1977. He then moved back to Bailey Island and resumed going to the beach. During his four years in the Army, he returned to Bailey Island and stayed with his parents at the house his father built on Bailey Island in the 1960s, where his mother still lives. He visited one time during his Army years and stayed a few weeks. He went to the beaches with the friends he grew up with.

From 1973 to 1977 he lived in California. Since that time, he has lived in Maine and he has not been away for extended periods of time. When he returned in 1977, he spent the following summer at the beach. He walked to the beach during the different seasons. By Labor Day, the water was cold and swimming ended.

During the summers, through 1970, there were about twenty people on each beach. The population of Bailey Island, a "tight-knit community," fluctuates but is higher now with more summer people and more year-round people. During the 1970s, he recognized people on the beaches and saw non-locals as well. People from the restaurants and inns and summer people staying on the island visited the beaches.

From 1970 to 1973 in the summer, he continued to visit the beach two or three times per week. He worked mowing lawns and raking moss and had a flexible schedule. During his time off, he used the beach on weekends and weekdays. From late 1977 to present day, he has continued to use the beaches.

During his use through 1973, Mr. Johnson never saw a "no trespassing" sign. No one ever told him to get off the road or the beaches. He did not ask for permission to use the road or the beaches.

He was aware of a chain across Cedar Beach Road in the area where the black and orange roads join on the map. (Pls.' Ex. 71, 17.) The chain was low, a few inches off the ground. The chain was down sometimes and never had a padlock attached to it. There was a path around the chain, which was well worn from years of bicycles and other traffic. The chain was attached to two rusty, angle iron posts, like the post depicted in one photograph in exhibit 69. (Pls.' Ex. 69, 0022.) He recalled that the chain had always been there.

At one point after he returned to Maine, he saw an eight-foot high, ten-foot wide chain link fence in the bushes in the black area of the road (Pls.' Ex. 71, 17.) Supporting columns were connected to the fence. He had never seen that fence standing up. Apparently, someone installed the fence and it was taken down. The fence was not in the road for more than one day.

In his affidavit prepared in this case, Mr. Johnson stated that in 1979, an owner of property on Cedar Beach Road, who he believed was Meredith Starbranch, erected a fence on Cedar Beach Road just after the intersection with Robinhood Road and before the chain. He stated further in the affidavit the fence was designed to prevent walkers from accessing the walkway and was torn down by Scott Allen who does not live on Cedar Beach Road. (Def. Gables Real Estate, LLC's Ex. 94.)

From his first memory through 1987, Mr. Johnson never asked permission to use the beach or the road. He never saw a "no trespassing" or "keep out" sign on the road or at the beaches. He never saw a chain or rope across the road attached to a tree. He never saw signs like the signs depicted in the photographs attached to the Meredith Starbranch affidavit. (Pls.' Ex. 78.) He did not believe those photographs depicted Cedar Beach Road because the background was

wrong. Cedar Beach Road on the ridge on either side is heavily forested and has been for fifty years. He never saw the Town of Harpswell or the State of Maine maintain Cedar Beach Road.

### 18. Terri Pontbriand

Terri Pontbriand was born in 1956. She lived on Orrs Island and then lived on Bailey Island from 1958 until 1978. As a child, she went to the beach everyday in the summer and sporadically during other months. As a teenager, she visited the beach once or twice per week. She described the beach as a really pleasant place for a walk in the evening.

In 1978, she married and moved to Auburn but returned to Bailey Island weekly. She moved to Durham in 1980. When she lived in Auburn and Durham, she continued to visit but less frequently because she had children and a job. She visited her mother and father at least two weekends per month and walked the beach.

On nice days in the 1960s, 1970s, and 1980s, it was not unusual to see more than ten families on the beach with children. Depending on the day, the sun, and the tide, the number of people at the beach could exceed forty. It was not possible to know where the people came from. She assumed some came from the cottages and some were year-round people but "a hodgepodge" of people used the beach.

She recalled a gate, located closer to Robinhood Road than the beach, on the dirt road used to walk to the beach. (Pls.' Ex. 71, 17.) The gate included orange rusty posts and a knee-high chain strung between the posts. People either walked over the chain or followed a well-worn path to the left side of the chain.

44

There was a ridge located on the Campbell property. (Pls.' Ex. 71, 17.) Adults and kids traveled a winding path from Cedar Beach Road to Fresh Water Cove, where some had boats. They walked around the ledges, followed the path on the Campbell property to the Abrahamson property to reach the small beach, and continued on the ledges.

Ms. Pontbriand never had permission to use the beach or the road. She never knew she needed permission to do either one.

During the past year, she learned from her brother about a fence in the Cedar Beach Road area. She was not on the island at the time. In August 2012, she signed an affidavit prepared in this case. (Def. Gables Real Estate, LLC's Ex. 95.) In the affidavit, Ms. Pontbriand states that in 1979, an owner of property on Cedar Beach Road erected a fence on Cedar Beach Road just after the intersection with Robinhood Road and before the chain between two posts. The fence was designed to prevent walkers and bikers from accessing to the walkway. The fence was removed within one day by Scott Allen, who does not live on Cedar Beach Road. (Gables' Ex. 95.) The affidavit refreshed her recollection regarding when she learned about the fence. The Cedar Beach controversy has been going on much longer than one year.

### 19. Mark Haley

Mark Haley lives in Cape Elizabeth. He is a retired lawyer who consults on a part-time basis for some of his former employers. He is familiar with Cedar Beach Road because his parents bought property in 1968 at the terminus of the road. (Pls.' Ex. 15.) His family's deed contained a right-of-way over Cedar Beach Road. He was nineteen years old and at Bowdoin at the time of the purchase. The Cedar Beach Road property was "entertainingly close" and Mr. Haley and

45

his fraternity brothers used the cottage for parties. He was at the property quite frequently, including spring and summer and very frequently in the fall. He would spend a few hours up to a few nights at the cottage.

He attended law school and returned in 1974. He lived in Brunswick and used the Bailey Island property frequently on nights and weekends. The Haleys rented their summer home to the Lesters for at least part of the summer for ten years from 1975 to 1985. The Haley property was sold in 1986.

Mr. Haley recalled two steel I-beams, two feet in height, in place at the head of Cedar Beach Road at the time his family purchased the property. Photograph 22 in exhibit 69 depicts what Mr. Haley refers to as the I-beams. (Pls.' Exs. 71, 17; 69, 0022.) A length of chain went through eyelets of the two posts and was secured by a lock with a key. Mr. Haley did not know who put up the chain or lock. His father was given keys to the lock, which was not always locked. On occasion, Mr. Haley left, he unlocked the chain and left it on the ground because he expected to be back in fifteen minutes. He could not recall an occasion when the chain was left unlocked and down for more than a few hours. His family continued to lock the chain on a regular basis. If they did not lock the chain, there would be a lot of cars down the road, parked in driveways, which prevented owners from leaving their property.

There were cheap, white tin signs with red paint that read, "private property" nailed on trees at the head of the road. He could not recall if the sign said anything else. The sign was in place for more than one week. He believed there were other signs put up by owners along the road on both sides but he could not be certain.

Throughout the time he spent at the beach and the property, there were problems with regard to use of the road and the beach. The road and the fire lane were blocked, which prevented ingress and egress. The problems at the beach were of a different nature and grew progressively worse. Primarily at night, there were many parties, fires, beer cans, and dogs. The dog owners did not clean up after their dogs. The beach was trashed. Mr. Haley called the sheriff to get people off the beach because Mr. Haley was worried about fire danger. He recalled dealing fairly regularly with the Cumberland County Sheriff's Office in an effort to remove people from the property.

Additional action was taken to block access to Cedar Beach Road. In 1978, 1979, or 1980, Mr. Haley's father, brother, cousin, and Mr. Haley erected posts on either side of the road and two pieces of a six-foot chain link fence to prevent ingress, to keep people out. This effort was not directed at one class of people. The problem had become so serious that they decided to put up the fence.

The fence was mowed down and the chain was broken by a pick-up truck driven by Scott Allen. Mr. Haley called Scott Allen; Mr. Haley knew Mr. Allen and his father. Mr. Haley asked Mr. Allen to meet at the property and to replace the chain and pay for the value of the chain link fence. Mr. Allen paid the money at Mr. Haley's office in Bath and replaced the chain. They did nothing further after erecting this chain link fence because it was "an exercise in futility," even though Mr. Haley was concerned about the property. The access issue had become a very passionate and emotional issue among all of the various parties. Rightly or wrongly, they were concerned about vandalism when they were not at the property.

### 20. Joan Lester

Joan Lester lives in Boston. She recently retired as a professor of Native American Studies at Tufts. Her specialty is Native American art from New England.

The Lester property is surrounded by the Aspatore property. (Pls.' Ex. 71, 17.) Cedar Beach continues to the Atkins property. The Atkins property includes a beach on the eastern side and a walkway and a beach on the northern side. The owners prefer that no one use these beaches and have posted a "private property" sign. Ms. Lester has used the small beach many times with her children and grandchildren. The Abrahamsons have generously allowed her grandchildren to use the beach

Her first encounter with Bailey Island occurred during her honeymoon in 1960. She and her husband stayed at Spruce Ledge at the end of the island. They rented a place each summer during the 1960s to 1975. They parked on the road and walked with their children to the beach. From 1975 until 1985, they rented the Haley cottage for long weekends and one week in the summer. From 1985 to 1990, they rented other houses on the island. During these years, they put their towels and chairs in their inflatable boat and carried the boat down Cedar Beach Road to the beach.

The Lesters purchased their property in 1990. The Perrys were constructing a house at the time. The construction was never completed.

Ms. Lester did not see a fence on Cedar Beach Road and never saw "no trespassing" or "private property" signs. There were signs on trees with the neighbors' names on them. There was a chain, which was locked when the Haleys owned the property and which was sometimes down. There was a path

around the chain. She saw many people stepping over or going around the chain and she and her husband did the same.

When they rented in the area, there were often very loud noisy parties. Because she was a renter, she did not feel entitled to call the sheriff. Her neighbors did call and law enforcement arrived and broke up the parties.

They saw bottles, candy wrappers, and cigarette butts on the beach in front of her property. The stone steps leading to her beach were sometimes blocked and the people would be indignant if she asked them to move. She began asking where people were from; they were from Canada and other states and were staying at the motel.

Dogs were a big issue. People brought dogs to the beach, walked them off-leash, and let them run wild. The dogs stole the children's sandwiches.

Cedar Beach Road is the only way to get to her property by land. There is an eight-to-ten-foot high fence by the Atkins property. It is not possible to see over or through the fence. It was installed a few years ago and was there last summer.

She responded to the Town of Harpswell survey regarding use. (Def. Gables Real Estate, LLC's Ex. 97.) She referred to signs Mr. Perry put up after she bought her property. Mr. Perry said too many people were coming down. The signs said, "no vehicles, road is only for islanders and their guests." When she stated in her response to the Town of Harpswell's questionnaire that there had always been signage and, since 1965, a chain, she meant that people could not drive down the road. The only other signs she recalled displayed the names of owners until Mr. Abrahamson put up his sign.

49

She recalled two cement pillars with a chain. She did not recognize what was depicted in photograph 22 in exhibit 69. (Pls.' Ex. 69, 0022.) She did not believe a road appeared behind the cement post in photograph 20. (Pls.' Ex. 69, 0020.)

To her knowledge, neither the Town of Harpswell nor the State of Maine maintained Cedar Beach Road. Mr. Abrahamson maintained the road and Mr. Perry tried to maintain the road when he had funds. The road was a mess with big caverns and care was required when driving.

B. Assessment

The above is a summary of each witness's testimony. Unless otherwise stated,[12] the court found the testimony of the witnesses to be credible.[13] Inconsistencies and discrepancies in the testimony of most of the witnesses were

---

[12] Ms. Atkins is the owner of a real estate company doing business in Florida and Maine. She testified that she did not know if her easement covered the entire length of Cedar Beach Road, that she does not understand the technicalities of easements, that she did not recall the purchase price of her purchase and sale agreement with the Abrahamsons, and that she only presumes they cannot sell the road to anyone but her because she does not know the nuances of contract law. This testimony, although not particularly relevant to the issues to be decided, was not credible.

Mr. Starbranch, Jr. and Mr. Starbranch, Sr. were gracious witnesses. Mr. Starbranch, Jr.'s familiarity with Bailey Island was, however, based on three visits; the last visit was in 1970 when he was eight years old. Mr. Starbranch, Sr.'s familiarity with Bailey Island was based on two visits; the last visit was in 1967. The fact that their relationship with Bailey Island was minimal and occurred more than forty years ago likely accounts for their lack of memory and necessarily affects consideration of those things they believe they do remember. In contrast, other witnesses lived and/or visited for years in the area of Cedar Beach Road, walked down Cedar Beach Road very frequently, and had the opportunity to observe who and what was there.

[13] The court is mindful of the following frequently used jury instruction: "Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to question such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently, and innocent mistakes in memory sometimes happen. In weighing the effect of any discrepancy, always consider whether it relates to an important issue or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood." Alexander, Maine Jury Instruction Manual § 6-24, at 6-41 (2013 ed.).

50

not the result of intentional falsehood and did not affect the court's assessment of credibility or the court's conclusions.

CONCLUSIONS

A. Prescriptive Easement

Maine has long accepted the doctrine that the public can acquire a non-possessory interest in land. Stickney v. City of Saco, 2001 ME 69, ¶ 15, 770 A.2d 592; Town of Manchester v. Augusta Country Club, 477 A.2d 1124, 1128 (Me. 1984). "The party asserting a public, prescriptive easement must prove: (1) continuous use; (2) by people who are not separable from the public generally; (3) for at least twenty years; (4) under a claim of right adverse to the owner; (5) with the owner's knowledge and acquiescence; or (6) a use so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed. Lyons v. Baptist Sch. of Christian Training, 2002 ME 137, ¶ 15, 804 A.2d 364.

(1) Continuous Use

"Continuous use 'occur[s] without interruption.'" Almeder v. Town of Kennebunkport, 2014 ME 12, ¶ 22, ___ A.3d ___ (quoting Stickney, 2001 ME 69, ¶ 18, 770 A.2d 592). Daily, weekly, or monthly use is not required. Continuous use requires "the kind and degree of occupancy (i.e., use and enjoyment) that an average owner would make of the property." Almeder, 2014 ME 12, ¶ 22, ___ A.3d ___ (quoting Stickney, 2001 ME 69, ¶ 18, 770 A.2d 592).

Defendants do not dispute continuous use, although they use the term, "continuous trespass." (Defs.' Br. 15.) Based on the testimony of Mr. Starbranch, Jr., Mr. Starbranch, Sr., Ms. Baribeau, Ms. Jensen, Ms. Johnson, Mr. Jackson, Ms. Merrill, Mr. Hill, Ms. Lefavor, Ms. Skillings-Goff, Mr. Johnson, Ms. Pontbriand, Mr. Haley, and Ms. Lester, plaintiffs have proved continuous use of Cedar Beach

51

Road[14] from 1959 through 1987.[15] Although the most frequent use occurred during the summer months, people used the road during non-summer months as well.

### (2) By People Not Separable from the Public Generally

"To create a public easement, . . . the adverse use must be general and not limited to a few specific individuals . . . . The test of a public use is not the frequency of the use, or the number using the way, but its use by people who are not separable from the public generally." Flaherty v. Muther, 2011 ME 32, ¶ 81, 17 A.3d 640; see also S.D. Warren Co. v. Vernon, 1997 ME 161, ¶ 16, 697 A.2d 1280. The landowner must be notified the general public, not individuals, claims an adverse right. Mary Shields, Note, Public Easements in Spectrum: A Solution to Protect the Public Interest, 66 Fed. Comm. L.J. 177, 191 (2013); see Restatement (Third) of Property (Servitudes) § 2.18 cmt. c (2000). "The adverse use that leads to creation of the servitude provides the basis for determining its terms." Flaherty, 2011 ME 32, ¶ 83, 17 A.3d 640; see id. ¶ 84 (use by three households, one for twenty years, one for ten years, and one for one year, was not sufficient to provide notice to landowner that entire neighborhood of nineteen households was claiming an easement). Use of a private road by owners or residents of land adjacent to the road is not for a public purpose of benefit; use by those without interest in the adjacent land may be a public use. Shields, supra, at 191.

---

[14] Because Cedar Beach Road is the only land route to the beach and was the route consistently used by members of the public, there is no issue with regard to the physical extent of the easement. Mary Shields, Note, Public Easements in Spectrum: A Solution to Protect the Public Interest, 66 Fed. Comm. L.J. 177, 192 (2013).
[15] Although legally effective, the 1987 and 1999 notices deterred few from using the road until Mr. Abrahamson erected the barrier on Labor Day 2011.

Based on the testimony of Mr. Starbranch, Jr., Ms. Baribeau, Mr. Goodwin, Ms. Jensen, Ms. Johnson, Mr. Jackson, Ms. Merrill, Mr. Hill, Ms. Jackson, Ms. Lefavor, Ms. Skillings-Goff, Mr. Johnson, Ms. Pontbriand, Mr. Haley, and Ms. Lester, plaintiffs have proved use by people not separable from the public generally. The witnesses, their families and friends, people who owned property on Bailey Island, people renting property on Bailey Island, people visiting Bailey Island, people who were recognized by the witnesses and people who were not recognized, and people from other states and countries used Cedar Beach Road.

(3) <u>For at Least Twenty Years</u>

"The prescriptive period includes any twenty-year span in which adversity and acquiescence have been continuously maintained." <u>Almeder</u>, 2014 ME 12, ¶ 22, ___ A.3d ___; <u>Flaherty</u>, 2011 ME 32, ¶ 80, 17 A.3d 640. Defendants argue the Perrys' sign prohibiting vehicles precludes plaintiffs from proving a twenty-year period. (Defs.' Br. 18.) Based on Ms. Lester's testimony, the court concludes the sign was put up after the Lesters purchased their property in 1990.

Based on the testimony of Mr. Starbranch, Jr., Mr. Starbranch, Sr., Ms. Baribeau, Mr. Goodwin, Ms. Jensen, Ms. Johnson, Ms. Merrill, Mr. Hill, Ms. Lefavor, Mr. Johnson, Ms. Pontbriand, Mr. Haley, and Ms. Lester, plaintiffs have proved continuous use of the road for more than twenty years.

(4) <u>Under a Claim of Right Adverse to the Owner</u>

"Adversity is established by evidence that the claimant has used the property (1) in the absence of the owner's express or implied permission, and (2) 'as the owner would use it, disregarding [the owner's] claims entirely, using it as

53

though he own[s] the property himself' (3) such that the use 'provided the owner [] with adequate notice that the owner's property rights are in jeopardy.'" Almeder, 2014 ME 12, ¶ 20, ___ A.3d ___ (quoting Lyons, 2002 ME 137, ¶¶ 17, 26, 804 A.2d 363); see Blanchard v. Moulton, 63 Me. 434, 436-37 (1873) ("[A]dverse use[] is nothing more than such . . . use of the property as the owner himself would exercise.") There is no subjective intent requirement. Almeder, 2014 ME 12, ¶ 21 n.12, ___ A.3d ___; see Dombkowski v. Ferland, 2006 ME 24, ¶¶ 23 n.6, 24, 893 A.2d 599 (eliminating intent requirement in adverse possession claims).

"[P]ublic recreational uses are presumed to be undertaken with the permission of the landowner, thereby defeating the adversity element of a prescription claim." Almeder, 2014 ME 12, ¶ 23, ___ A.3d ___ (citations omitted). "This presumption of permissive use does not result in burden shifting. It leaves with the plaintiffs the burden of proving adversity through a claim of right hostile to the owner's interest, without benefit of any presumption of adversity arising from long term public recreational uses of the land." Lyons, 2002 ME 137, ¶ 25, 804 A.2d 364; see Almeder, 2014 ME 12, ¶ 28, ___ A.3d ___.[16] Public recreational use "is consistent with and in no way diminishes, the rights of the owner in his land." Lyons, 2002 ME 137, ¶ 19, 804 A.2d 364.

The "open lands tradition" followed by Maine "recognizes the State's desire to encourage the hunting, hiking, and other outdoor activities for which Maine is celebrated and on which much of Maine's economy is based." Almeder,

---

[16] "The Law Court in Almeder stated, "the burden of proof is on the claimant to rebut the presumption of permission in order to establish adversity." Almeder, 2014 ME 12, ¶ 28, ___ A.3d ___. The Law Court in Lyons stated, "[t]his presumption of permissive use does not result in burden shifting. It leaves with the plaintiffs with the burden of proving adversity through a claim of right hostile to the owner's interest, without the benefit of any presumption of adversity arising from long term public recreational uses of the land." Lyons, 2002 ME 137, ¶ 25, 804 A.2d 364.

2014 ME 12, ¶ 24, ___ A.3d ___ (citations omitted); see Lyons, 2002 ME 137, ¶ 24 & n.6, 804 A.2d 364. The Law Court recently stated:

> The presumption recognizes that public recreational use is consistent with, and in no way diminishes, the rights of the owner in his land. Particularly for land that is not being actively used by its owner, the claimant's use can be better regarded as permissive until affirmatively shown to be adverse. Thus, the presumption offers a double benefit of protecting landowners from equitable claims to the use of their properties (as well as to their titles) while allowing the public to continue to use the property for recreational purposes. Finally, the presumption reflects our long-standing disapproval of public recreational easements by prescription: In a consistent line of cases this court has declined to hold that the mere use by the general public of wild and uncultivated land as a route for hauling seaweed, for hunting, or for mere pleasure or recreation, is sufficient to show the adverse use essential to create a prescriptive easement.

Almeder, 2014 ME 12, ¶ 25, ___ A.3d ___ (internal quotations and citations omitted).

The Law Court clarified in Lyons that the presumption of permission depends on how the public uses the land and not on the type of land at issue. See Almeder, 2014 ME 12, ¶ 27, ___ A.3d ___; Lyons, 2002 ME 137, ¶¶ 20-25, 804 A.2d 364. The presumption has been applied to children playing on a vacant lot, to hunters and snowmobilers crossing a field, to families camping on wood lots, and to neighbors using a road on a landowner's wooded lot. See Lyons, 2002 ME 137, ¶ 24, 804 A.2d 364. The presumption has also been applied to cases involving public use of private beaches. See Almeder, 2014 ME 12, ¶ 27, ___ A.3d ___; Town of Manchester, 477 A.2d 1124, 1126 (Me. 1984); Littlefield v. Hubbard, 124 Me. 299, 304, 128 A. 285, 288 (1925).

A lengthy history of a town's maintaining, patrolling, and enforcing laws and conducting public gatherings on contested property has been sufficient to support a claim of a public prescriptive easement. Lyons, 2002 ME 137, ¶¶ 28-30,

804 A.2d 364 (discussing Eaton v. Wells, 2000 ME 176, 760 A.2d 232)[17]; see Almeder, 2014 ME 12, ¶ 31, ___ A.3d ___ (Town's expenditure of funds to provide public conveniences and increase tourism and establishment of parking regulations and other uses at the beach not sufficient to overcome the presumption of permission); Bayberry Cove Childrens' Land Trust v. Town of Steuben, 2013 ME 35, ¶ 9, 65 A.3d 1188 (Town's "minor and sporadic" maintenance of the road did not prove continuous use of road for required period); Stickney, 2001 ME 69, ¶¶ 1, 3, 770 A.2d 592 (City maintained road for over forty years; Law Court determined road was a public way); Town of Manchester, 477 A.2d at 1130 (Town's expenditure of time and money to keep right-of-way repaired and assistance with maintenance and security of the beach were voluntary actions that were subordinate to Club's ownership of beach). Town or state involvement in maintenance of a public prescriptive easement is not, however, a prerequisite for such an easement. See Town of Kittery v. MacKenzie, 2001 ME 170, ¶ 16 n.10, 785 A.2d 1251.

It is clear from this record neither the Town of Harpswell nor the State of Maine was involved in any way with Cedar Beach Road. Although a public entity's involvement in the easement, such as maintenance, is evidence of adversity, that involvement is not required to establish adversity, as defendants argue. (See Defs.' Br. 14-17.)[18]

---

[17] In Almeder, the Law Court criticized the decision in Eaton v. Town of Wells, cited by plaintiffs. Almeder, 2014 ME 12, ¶ 27 n.16, ___ A.3d ___; Eaton v. Town of Wells, 2000 ME 176, 760 A.2d 232.

[18] Defendants cite Lyons to argue that absent the involvement of a town or municipality, a group of individuals representing the public cannot prevail in a case involving a public prescriptive easement because they are unable to demonstrate the requisite maintenance and control consistent with ownership. Defs.' Mem. at 17, n.14; Lyons, 2002 ME 137, ¶¶ 34-38, 804 A.2d 364. Defendants cite to the dissent in Lyons. The portion of

### a. Owners' Permission

Actual permission to use the road ended with Dr. McCarty's death. There was no express or implied permission from Ms. Sturtevant or Ms. Starbranch and none was requested. They never would have given permission to use the road.

### b. Use of Property

The claimants must have used the property "as the owner would use it, disregarding [the owner's] claims entirely, using it as though he own[s] the property himself." Almeder, 2014 ME 12, ¶ 20, ___ A.3d ___ (quotation marks omitted). Although Ms. Baribeau, Mr. Goodwin, Ms. Jensen, Ms. Johnson, Mr. Jackson, Ms. Merrill, Mr. Hill, Ms. Jackson, Ms. Lefavor, Ms. Skillings-Goff, Mr. Johnson, Ms. Pontbriand, and Ms. Lester testified about the chain and about stepping across or around the chain, their intent when crossing the chain forms the foundation for adversity. Ms. Baribeau understood that pedestrian access on the road was permitted. Mr. Goodwin's family owned what is now the Aspatore property and had an easement over Cedar Beach Road. (Pls.' Ex. 45.) Ms. Jensen interpreted the chain as a device to keep cars off the road. Ms. Johnson believed the chain was in place to stop cars from going down the road. Mr. Jackson never asked permission to use the road because he thought it was a public area for many, many years, he thought the road was possibly public, someone was maintaining it, and the road led to the beaches. Ms. Merrill never asked permission to use the road because, traditionally, she did not think permission was needed. Mr. Hill was never told not to use the road but he was not asked about whether he asked for permission or whether he believed permission was

---

the road maintained by the Town of Mapleton was not disputed in Lyons. See Lyons, 2002 ME 137, ¶37, n.8, 804 A.2d 364.

required. Neither Ms. Jackson nor Ms. Lefavor asked for permission to use the road. Ms. Skillings-Goff thought the road was privately owned by more than one family, did not ask permission to use the road, and used the road. Mr. Johnson did not ask for permission to use the road. Ms. Pontbriand did not have permission to use the road and never knew she needed permission to use the road. Ms. Lester enjoyed a right-of-way over the road from 1975 to 1985. At other times when her family rented on the island, her family walked down the road.

Except for the testimony of Ms. Skillings-Goff, the testimony of these other witnesses may be insufficient to prove adversity in light of the presumption. See Almeder, 2014 ME 12, ¶ 28, ___A.3d___; Lyons, 2002 ME 137, ¶ 27, 804 A.2d 364. The court concludes, however, that the actions of other members of the public demonstrated the requisite "hostility or antagonistic intent." Lyons, 2002 ME 137, ¶ 26, 804 A.2d 364. Based on the testimony of Mr. Starbranch, Jr., Mr. Starbranch, Sr., Mr. Haley, and Ms. Lester, it is clear that members of the public engaged in loud noisy parties from at least 1962 through 1986. People used alcohol, littered, and allowed dogs to roam and defecate, and rendered the property a "trash heap" that required hours to clean up. The owners became concerned about using the property themselves and about liability. They were afraid they would lose the road and they were afraid of the people using the road. On occasion, the Sheriff's office was called by neighbors and responded to break up the parties; more often, the Sheriff's office was unresponsive.

The problems became so serious that members of the Haley family in 1978, 1979, or 1980 decided to erect two six-foot chain link pieces of fence in the road. The fence was mowed down by a pick-up truck within days. Because of

58

continuing problems, the Haleys declined to take further action because, they determined, such action would have been futile.

This conduct is sufficient to establish adversity. This use demonstrates the public members' disregard for the owners' rights and use of the property as their own, which the owners acknowledged and were very concerned about. Lyons, 2002 ME 137, ¶ 26, 804 A.2d 364. This use exceeds traditional recreational use and was clearly undertaken without permission. Almeder, 2014 ME 12, ¶ 25, ___ A.3d ___.

### c. Notice to Owners their Rights in Jeopardy

Ms. Sturtevant and Ms. Starbranch were given adequate notice that their rights were in jeopardy. They complained about people using the property, the parties, and the littering. Their concern about the use of the road was nonstop. Ms. Sturtevant became incensed about people accessing and using the little beach. Ms. Sturtevant and Ms. Starbranch feared the value of their property would be affected if they lost the road and no longer had a private road.

Plaintiffs have satisfied the Almeder and Lyons requirements. See Almeder, 2014 ME 12, ¶ 20, ___ A.3d ___; Lyons, 2002 ME 137, ¶¶ 17, 26, 804 A.2d 363). Plaintiffs have proved adversity.

### (5) With the Owner's Knowledge and Acquiescence or Use So Open, Notorious, Visible, and Uninterrupted that Knowledge or Acquiescence Will Be Presumed

"Knowledge and acquiescence may be established either by proof of actual knowledge and acquiescence, or by proof of a use 'so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed.'" Almeder, 2014 ME 12, ¶ 21, ___ A.3d ___ (quoting Androkites v. White, 2010 ME

59

133, ¶ 14, 10 A.3d 677). "Acquiescence by the owner to the use is essential . . . . Acquiescence implies 'passive assent or submission to the use, as distinguished from the granting of a license or permission given with the intention that the licensee's use may continue only as long as the owner continues to consent to it.' Acquiescence is 'consent by silence.'" Town of Manchester, 477 A.2d at 1129-30 (quoting Pace v. Carter, 390 A.2d 505, 507 (Me. 1978) and Dartnell v. Bidwell, 115 Me. 227, 230, 98 A. 743, 745 (1916)). Breaking the silence by denials or remonstrances is evidence of nonacquiescence. Dartnell, 115 Me. at 230, 98 A. at 745. One demonstration of nonacquiescence will interrupt a claim of prescriptive easement. See id. (one letter sufficient evidence of nonacquiescence). Actual interruption of claimant's use or possession is not required. Dowley v. Morency, 1999 ME 137, ¶ 23, 737 A.2d 1061. Nonacquiescence may be shown by "verbal protest alone." Noyes v. Levine, 130 Me. 151, 152, 154 A. 78, 79 (1931); see Mumme v. Clark, 1998 Me. Super. LEXIS 132, at *11 (May 15, 1998) (conduct and language showing landowner's resistance to claimants' use of alleged right-of-way precluded finding of acquiescence). "Acquiescence differs from adversity in that adversity regards the actions of the claimant, whereas acquiescence looks to the actions of the owner." Almeder, 2014 ME 12, ¶ 21, ___ A.3d ___; Dowley, 1999 ME 137, ¶ 23, 737 A.2d 1061.

Notice or efforts to interrupt the user of the land must come from the owner. See McIntire v. Talbot, 62 Me. 312, 313 (1873) ("The admissibility of the testimony of N.T. Talbot, one of the defendants, in relation to the efforts of Mr. E. Thorndike, senior, to interrupt the user of the way in 1854, depends upon whether Thorndike at that time had a title to the servient estate which has been transmitted to the defendants."); Stickney, 2001 ME 69, ¶ 23, 770 A.2d 592 (owner

60

never obstructed use of lane); Dowley, 1999 ME 137, ¶ 24, 737 A.2d 1061 (oral and written notice from party's attorney to discontinue use sufficient evidence of nonacquiescence); Glidden v. Belden, 684 A.2d 1306, 1317 (Me. 1996); O'Connor v. Beale, 143 Me. 387, 392-93, 62 A.2d 870, 873 (1948); Noyes, 130 Me. at 152, 154 A. at 78-79; Dartnell, 115 Me. at 231, 98 A. at 745.4 Tiffany Real Prop. § 1205 (3d. ed. 2010) ("interruption of the user by a third person is immaterial"); James W. Ely, et al., Law of Easements & Licenses in Land § 5:16 (2014) ("Actions by a third person do not interrupt an adverse usage because they do not represent an assertion of dominion by the owner."). The notice must communicate "a demand to quit or other statement of nonacquiescence." Dowley, 1999 ME 137, ¶ 26, 737 A.2d 1061. The notice must notify those claiming an easement, in this case "the public." See Dartnell, 115 Me. at 232, 98 A. at 745.

If use is open, notorious, visible, and uninterrupted, knowledge and acquiescence will be presumed. Lyons, 2002 ME 137, ¶ 15, 804 A.2d 364. Use is "open" if it is "without attempted concealment." Striefel v. Charles-Keyt-Leaman P'ship, 1999 ME 111, ¶ 11, 733 A.2d 984 (claim of adverse possession). Use is "visible" if it is "capable of being seen by persons who may view the premises." Id. Use is "notorious" if "known to some who might reasonably be expected to communicate their knowledge to an owner maintaining a reasonable degree of supervision over his property." Id. These requirements provide the landowner with adequate notice that his "property rights are in jeopardy." Id.

Defendants argue the following actions show nonacquiescence on the part of the landowners:

(1) Harry Starbranch, Jr. told people not to use the road when he was six, seven, or eight years old. Mr. Starbranch, Jr. was not the owner of the road.

61

Further, he was not the agent of the owners. See Restatement (Third) of Agency §§ 2.01, 2.03 (2006) (setting forth the requirements for actual and apparent authority). The owners did not know about Mr. Starbranch, Jr.'s conduct until it was completed. When they did learn, he was told not to do this again.

(2) Harry Starbranch, Jr. testified there was a sign near the chain to deter trespassers. Mr. Starbranch, Jr. visited Bailey Island three times as a child. His last visit was in 1970, when he was eight years old. The testimony Ms. Baribeau, Mr. Goodwin, Ms. Johnson, Mr. Jackson, Ms. Merrill, Ms. Skillings-Goff, Mr. Johnson, and Ms. Lester, who walked down Cedar Beach Road for years and never saw such signs,[19] is accepted as the correct version of events.

(3) The chain across the road showed the owners assertion of their right to control use of the road. The chain was installed by Dr. McCarty to deter vehicle traffic on Cedar Beach Road after a fire that may have been caused by a car. The low chain remained in various iterations and at various locations near the intersection of Robinhood and Cedar Beach Roads. Based on the testimony of Ms. Baribeau, Ms. Jensen, Ms. Johnson, Ms. Merrill, Ms. Skillings-Goff, and Ms. Lester, the court concludes the chain's continued purpose was solely to continue Dr. McCarty's desire to prevent vehicles from traveling down Cedar Beach Road. Based on the testimony of Mr. Haley and Ms. Lester, the court concludes the chain had a lock during the period when the Haleys owned property on Bailey Island.[20]

---

[19] Mr. Starbranch, Jr. saw a sign but could not remember what the sign said. Mr. Starbranch, Sr. saw no signs. Mr. Haley did not testify about seeing "no trespassing" signs. As discussed below, Mr. Haley saw cheap tin signs that read, "private property."
[20] The court does not accept the testimony on this issue from Mr. Johnson, who stated there never was a padlock on the chain, or from Mr., Starbranch, Sr., who stated he put a padlock on the chain to keep people out.

62

(4) The photo of the metal post that supported the chain for some time showed the remnants of the word "private" were still visible. Robert Jackson stated that the post depicted in photograph 22 in exhibit 69 was a good distance down the road from the posts at the head of the road. He did not see a sign near the chain and during all the years he discussed in his testimony, he never saw "no trespassing" or "private property" signs. Mr. Jackson was asked about the post, not the remnants of the sign on the post.

Wendy Lefavor stated that the chain was attached to the post depicted in photograph 22 in exhibit 69. She also stated she never saw signs on the road during the 1960s, 1970s, and 1980s. Ms. Lefavor was asked about the post, not the remnants of the sign on the post.

Kevin Johnson stated that the post depicted in photograph 22 in exhibit 69 looked like the rusty angle iron post the chain was attached to. He also stated that from the late 1950s until 1973, he never saw any "no trespassing" or "keep out" signs of any kind. Mr. Johnson was asked about the post, not the remnants of the sign on the post.

Mark Haley stated that the chain was attached to two steel I-beams and that photograph 22 in exhibit 69 depicted the I-beams. He also was asked about the post, not the remnants of the sign on the post. When asked whether there were signs at the end of the road, he stated there were cheap, white with red paint "private property" tin signs nailed to trees.

Mr. Jackson's recollection of the post depicted in photograph 22 of exhibit 69 is reliable because his recollection was refreshed during the view on April 29, 2014. The post was located a good distance down the road from the chain near

the head of the road. No one identified or saw the remnants of the word "private" on the post.

(5) Mark Haley's testimony that he remembers a "private property" sign in 1968. As discussed above, Mr. Haley noticed a cheap white tin sign with red paint that read, "private property." He did not testify when he saw the signs[21] and he did not testify about who may have posted the signs.

(6) Mr. Haley testified he called the sheriff on multiple occasions to remove individuals from the property. Based on this record, Mr. Haley never owned property on Bailey Island.

(7) Testimony from plaintiffs and Mark Haley regarding a fence across the road during the late 1970s intended to stop pedestrian use of the road. In 1978, 1979, or 1980, this fence was erected by Mr. Haley's father, brother, cousin, and Mr. Haley. Based on this record, these individuals did not own Cedar Beach Road.

In his affidavit, Mr. Johnson discussed this fence and stated, "In 1979, an owner of property on Cedar Beach Road, I think it was Meredith Starbranch, erected a fence . . . ." His thought was clearly not correct on this record. In her affidavit, Ms. Pontbriand discusses the fence but does not identify any person she believes erected the fence.

(8) The 1979 letter from Julia Sturtevant to Sheriff Sharpe.

This letter was admitted over plaintiffs' objection as an ancient document pursuant to Rule 803(16).[22] M.R. Evid. 803(16). As discussed at trial, there is a difference between the admissibility of evidence and the weight to be given to

---

[21] Previously, he testified about I-beams present when his parents purchased the property. No time frame was requested or discussed with regard to the signs.
[22] Authenticity was not disputed.

64

the evidence. There is no other evidence in the record about this letter.[21]

Although defendants argue, "evidence that a letter was mailed raises a presumption of receipt by the addressee," there is no evidence in this record as to whether the letter was mailed. Accordingly, there is no evidence that those using the road received notice of nonacquiescence. See Dartnell, 115 Me. at 232, 98 A. at 745; Dowley, 1999 ME 137, ¶ 24, 737 A.2d 1061. The court has not considered the affidavit of Marlene Grimes, submitted by plaintiffs and the Abrahamson defendants in support of, and in opposition to, plaintiffs' motion for partial summary judgment dated 12/5/13. (Defs.' Mem. 7, n.5.) The affidavit was not offered into evidence at trial and likely would have been subject to objection.[24]

### (9) 1962 Notice

By statute, [25] a landowner may prevent others from acquiring rights through adverse use by posting a notice as follows

> If a person apprehends that a right-of-way or other easement in or over his land may be acquired by custom, use or otherwise by any person, class of persons or the public, he may give public notice of his intention to prevent the acquisition of such easement by causing a copy of such notice to be posted in some conspicuous place upon

---

[21] On the last day of trial, 5/29/14, defendants sought unsuccessfully to introduce documents defendants received from the Town of Harpswell, and provided to plaintiffs' counsel the previous evening. Defendant Gables Real Estate, LLC's counsel represented he had been seeking the documents for weeks. The first complaint was filed 10/124/12; discovery ended 11/5/13. These documents were not newly discovered evidence and should have been requested by defendants long before several weeks before trial.

[24] Defendants argue the court may take judicial notice of "pleadings, dockets, and other records of that court in the same or in other lawsuits." (Defs.' Br. 7, n.5); Field & Murray, Maine Evidence § 201.3 at 57 (6th ed. 2007) (citing Finn v. Lipman, 526 A.2d 1380 (Me. 1987)). In Finn, the husband sued the wife's divorce attorney. The court properly took judicial notice of the underlying divorce action. Finn, 526 A.2d at 1381. It is unlikely an affidavit, filed in a summary judgment proceeding, would be an appropriate subject of judicial notice at trial. See M.R. Civ. P 56(c) & (e). In any event, there was no request at trial for the court to take judicial notice. If there had been, the rule allows the opposing party an opportunity to be heard upon request. M.R. Evid. 201(d) & (e).

[25] Plaintiffs argue section 812 must be strictly construed. See Foisy v. Bishop, 232 A.2d 797, 799 (Me. 1967); Farrell v. Farrell, 118 Me. 441, 441, 108 A. 648, 649 (1920).

the premises for 6 successive days . . . . A certificate[x] by an officer qualified to serve civil process that such copy has been served or posted by him as provided, if made upon original notice and recorded with it, within 3 months after the service or posting in the registry of deeds for the county or district in which the land lies, shall be conclusive evidence of such service or posting.

14 M.R.S. § 812 (2013).

The affidavit of Meredith Starbranch provides, in part:

MEREDITH KELLS STARBRANCH, who being by me duly sworn, declared to me: That in accordance with Chapter 174, Section 12 of the Maine Revised Statutes, she had posted two notices of her intention to prevent the acquisition of a right-of-way or other easement in or over her land in conspicuous places upon her land commonly known as the "Ridge" property, that being the lot of approximately 2 ¾ acres on the eastern shore of Fresh Water Cove . . . this declaration is made upon her best information and belief, so help her God.

(Pls.' Ex. 78.)

This affidavit was offered by defendant Gables Real Estate, LLC as an ancient document pursuant to M.R. Evid. 803(16).[y] The affidavit was admitted over objection.[z] During trial on 5/28/14, plaintiffs filed a brief supporting their continuing objection to the admissibility of the affidavit. It was agreed defendants would respond to plaintiffs' argument in their post-trial brief. (Defs.' Br. 2-4.)

---

[x] There is no certificate in this case. (Order on Pls. and Defs.' Mot. for Summary Judgment dated 5/1/14 at 5.)

[y] At trial, defendants offered exhibit 78 pursuant to M.R. Evid. 803(6), (8), and (16). Defendants now rely on Rule 803(14) in their post-trial brief. M.R. Evid. 803(14); (Defs.' Br. 2.) That rule was not relied on at trial by defendants and plaintiffs have not had the opportunity to address that rule. This rule does not appear to apply to this notice, as opposed to a deed or other "document purporting to establish or affect an interest in property." M.R. Evid. 803(14). Further, the advisory committee notes provide, "the record is merely made admissible without giving it presumptive force. If there is a genuine controversy, more persuasive evidence should be sought." Field & Murray, supra, § 803.14 at 463. There is a genuine controversy on this record.

[z] The authenticity of the affidavit was not disputed.

66

Rule 803 does not dispense with the requirement of firsthand knowledge, which "may appear from [the] statement or be inferable from the circumstances." Fed. R. Evid. 803 advisory committee's note; see Brumley v. Albert E. Brumley & Sons, Inc., 727 F.3d 574, 579 (6th Cir. 2013); Columbia First Bank, FSB v. United States, 58 Fed. Cl. 333, 337 (Fed. Cl. 2003) (citing Fed. R. Evid. 803 advisory committee's note); Casco N. Bank, N.A. v. Estate of Grosse, 657 A.2d 778, 781 (Me. 1995) (although affidavit did not state it was made on personal knowledge, the affidavit shows affiant had had personal knowledge).

### a. Personal Knowledge

Ms. Starbranch had no personal knowledge of the posting described in her affidavit and, contrary to defendants' argument, personal knowledge cannot be inferred under the circumstances on this record. See Columbia First Bank, FSB, 58 Fed. Cl. at 337. Ms. Starbranch was in Texas during the entire year of 1962. The information that appears in the affidavit was transmitted from Ms. Sturtevant. For these reasons, Ms. Starbranch's attorney husband, Mr. Starbranch, Sr., added the "information and belief" language in the affidavit.

Defendants' further arguments that Ms. Starbranch caused her agent to post the property, confirmed the posting, and confirmed the photographs were on her property are not supported by this record. (Defs.' Br. 3.) Similarly, defendants' argument that the "portions of the affidavit related to the location of the posted signs, their content, and the photographs themselves are clearly admissible" because Ms. Starbranch was familiar with her property and was qualified to verify the signs were on her property also is not supported by this record. See, e.g., State v. Sargent, 361 A.2d 248, 251 (Me. 1976) ("The foundation

67

for admission of a photograph into evidence may properly be laid by any witness who knows that it fairly represents what it purports to represent.").

The circumstances surrounding the affidavit are troubling. It is unexplained on this record why Ms. Sturtevant engaged in the artifice of Ms. Starbranch's posting the property instead of Ms. Sturtevant's posting the property herself. This apparent unnecessary procedure, dictated by Ms. Sturtevant, resulted in the recording in the registry of deeds of a document containing incorrect Information. (Pls.' Ex. 78 ("MEREDITH KELLS STARBRANCH, who being by me duly sworn, declared to me . . . she had posted two notices . . . .").) Based on Ms. Starbranch's lack of personal knowledge and the dubious method requested by Ms. Sturtevant, the court accords no weight to exhibit 78.[*]

Based on this record and the circumstances surrounding the affidavit, the court concludes that Mr. Starbranch, Sr.'s testimony that Ms. Sturtevant, her husband, and Ms. Starbranch said they wanted to post the road does not make it more likely than not that the property was posted. No witness in this trial testified that he or she saw a sign like that depicted in the photographs attached to the affidavit. (Pls.' Ex. 78.) Ms. Skillings-Goff's testimony was particularly credible on this issue: if the property had been posted as the defendants suggest, there would have been public outrage and there would have been an issue in her own family about whether she, who has used the beaches every year of her life, could continue that use.

---

[*] In hindsight and after research, the court concludes exhibit 78 should not have been admitted. As discussed, although admitted, the court gives no weight to the affidavit.

68

### b. Location of Posting

In addition to the affidavit signed by Ms. Starbranch, about which she had no personal knowledge, Mr. Starbranch, Sr. signed a deed about which he had no recollection. (Pls.' Ex. 11.) The deed references the "Ridge lot . . . which consists of approximately 2 ¾ acres on the eastern shore of Fresh Water Cove." (Pls.' Ex. 11.) Mr. Starbranch, Sr. had no knowledge of a ridge lot. The affidavit provides the notices were posted on the "'Ridge property', that being the lot of approximately 2 ¾ acres on the eastern shore of Fresh Water Cove." (Pls.' Ex. 78.) The Cedar Beach Road parcel comprised approximately .28 acres. (Pls.' Exs. 9; 10.)

Assuming the 1962 notice was posted, which the court concludes has not been proved, the conclusion that the posting was on the Ridge property and not on Cedar Beach Road is supported by the language in the deed signed by Mr. Starbranch, Sr. and the Meredith Starbranch affidavit; the separate description of parcels I and II in the deeds, the testimony of Mr. Goodwin, Ms. Baribeau, Ms. Johnson, Mr. Jackson, Ms. Merrill, Mr. Hill, Ms. Lefavor, and Ms. Pontbriand about the Ridge property; the testimony of Mr. Jackson and Mr. Johnson about the background of the photographs; and Ms. Sturtevant and Ms. Starbranch's ongoing concern about the small beach.

Based on the testimony of Ms. Baribeau, Mr. Goodwin, Ms. Jensen, Ms. Johnson, Mr. Jackson, Ms. Merrill, Mr. Hill, Ms. Lefavor, Ms. Skillings-Goff, Mr. Johnson, and Ms. Lester, plaintiffs have proved actual acquiescence on the part of Ms. Sturtevant and Ms. Starbranch.

69

## B. Affirmative Defenses

The Abrahamson defendants asserted the following affirmative defenses: failure to state a claim; standing; contrary to public policy; laches; reference to any and all affirmative defenses and waiver of none; barred by the 1962, 1987, and 1989 notices; abandonment; statute of limitation; and easement by custom not recognized. Defendant Gables Real Estate, LLC asserted the following affirmative defenses: failure to state a claim; standing; contrary to public policy; laches; statute of limitation; barred by 1962,[*] 1987, and 1989 notices; abandonment; reservation of rights; and easement by custom not recognized.

Plaintiffs do not dispute the efficacy of the 1987 and 1989 notices. Plaintiffs withdrew count II of their amended complaint, the claim for acquisition of an easement by custom. Almeder, 2014 ME 12, ¶ 34, ___ A.3d ___; (Order of 5/9/14 at 1, n.1.) No further affirmative defenses were added or discussed. The defenses of failure to state a claim and that the plaintiffs' claims are contrary to public policy were not discussed or pursued at trial and are not addressed in defendants' post-trial brief.[*]

### 1. Laches

"Laches is the omission to assert a right for an unreasonable and unexplained length of time and under circumstances prejudicial to the adverse party." Longley v. Knapp, 1998 ME 142, ¶ 10, 713 A.2d 939; see Kelley v. Bhd. of R.R. Trainmen, 148 Me. 95, 99, 90 A.2d 717, 720 (1952) (laches applies "when it

---

[*] This affirmative defense is discussed above.

[*] The defense of the statute of limitations was also not addressed in defendants' post-trial brief and their position is unclear. As discussed with regard to laches, any judicially recognizable injury occurred when Mr. Abrahamson erected the barrier in 2011. See Johnston v. Dow & Coulombe, Inc., 686 A.2d 1064, 1065-66 (Me. 1996); see also 14 M.R.S. § 812; Almeder, 2014 ME 12, ¶ 22, ___ A.3d ___.

70

would be inequitable to enforce the right."); see also Stewart v. Grant, 126 Me. 195, 201, 137 A. 63, 66 (1927) ("If by the laches and delay of the complainant it has become doubtful whether the opposing parties can be in a position to produce evidence necessary to a fair presentation of their case, or if they are deprived of any just advantage which they might have had before the claim became stale and antiquated, the court in equity will deal with the claim as if barred.")

In this case, as in Longley, plaintiffs used the road for years until the road was blocked. They had no reason to seek declaratory relief until that time. Accordingly, their failure to assert their right to use the road was not unreasonable or unexplained and application of laches is not appropriate. Longley, 1998 ME 142, ¶ 11, 713 A.2d 939; see also Lyons, 2002 ME 137, ¶ 5, 804 A.2d 364 (after defendant erected barrier across road, plaintiffs brought suit alleging a public easement by prescription had been acquired).

2. Standing

In the order of 5/9/14 on defendant Gables Real Estate, LLC's motion for summary judgment, the court addressed the issue of standing and proof at trial. "Whether a party has standing to bring a claim is a jurisdictional question." N. E. Ins. Co. v. Young, 2011 ME 89, ¶ 11, 26 A.3d 794. As the Law Court has explained:

> Litigants normally may not assert the rights of third parties but must demonstrate that they have received some particularized injury in order to have standing to raise their claim. A person has suffered a particularized injury when the other party's actions have adversely and directly affected that party's property, pecuniary or personal rights.

Id. (internal citations and quotations omitted); see Halfway House, Inc. v. City of Portland, 670 A.2d 1377, 1379 (Me. 1996) ("Standing to sue means that the party,

71

at the commencement of the litigation, has sufficient personal stake in the controversy to obtain judicial resolution of that controversy.").

In Flaherty, the Law Court observed that it had "decided numerous cases regarding acquisition of prescriptive easements by individuals and the public." Flaherty, 2011 ME 32, ¶ 81, 17 A.3d 640 (citing Lyons, 2002 ME 137, ¶ 22 n.5, 804 A.2d 364; Blackmer v. Williams, 437 A.2d 858 (Me. 1981); Town of Kennebunkport v. Forrester, 391 A.2d 831 (Me. 1978)); see also Shadan v. Town of Skowhegan, 1997 ME 187, ¶¶ 6-7, 700 A.2d 245; S.D. Warren Co., 1997 ME 161, ¶ 17, 697 A.2d 1280.

The court concluded plaintiffs alleged an injury distinct from that of the general public because they alleged they used Cedar Beach Road to access the beach, that use had been denied, and they believed they have the right to continued use of the road. (Am. Compl. ¶¶ 1-2, 5, 7-8 13, 31.) The court concluded also that at trial, plaintiffs must show "use by people who are 'not separable from the public generally.'" S.D. Warren Co., 1997 ME 161, ¶ 17, 697 A.2d 1280 (quoting Forrester, 391 A.2d at 833 n.2); see also Stickney, 2001 ME 69, ¶ 18, 770 A.2d 592 ("[T]he test of a public use is the use of the road by people who are inseparable from the public generally . . . ."). That issue is discussed above.

The entry is

> The public has acquired a prescriptive easement over Cedar Beach Road, which is parcel II as described in a deed from Charles H. Abrahamson and Sally M. Abrahamson to Charles M. Abrahamson and Sally M. Abrahamson as Trustees of the Charles H. Abrahamson Living Trust dated June 13, 2003, and any amendments thereto, and Charles H. Abrahamson and Sally M. Abrahamson as Trustees of the Sally M. Abrahamson Living Trust, dated June 13, 2003, and

any amendments thereto. This deed is dated August 2, 2005 and is recorded in the Cumberland County Registry of Deeds in Book 23002, Page 280.

Date: September 15, 2014

_____
Nancy Mills
Justice, Superior Court

RE-12-392

| Plaintiffs: | David Bertoni, Esq.<br>Anne Torregrossa, Esq. |
|---|---|
| Defendants &<br>Intervenor | Christian Chandler, Esq.<br>Benjamin Leoni, Esq.<br>Sidney Thaxter, Esq.<br>Gerald Schofield, Esq. |

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-12-392

NM-CUM-5-9-14

CEDAR BEACH/CEDAR
ISLAND SUPPORTERS, INC.,
et al.,

      Plaintiffs

v.

CHARLES H. ABRAHAMSON,
et al.,

      Defendants

and

WELLS FARGO BANK, N.A.,

      Party-in-Interest

ORDER ON DEFENDANT
GABLES'S MOTION FOR
SUMMARY JUDGMENT

Before the Court is defendant Gables's motion for summary judgment. Gables makes two related arguments: (1) plaintiffs lack standing to sue on behalf of the general public; and (2) even if plaintiffs had standing to sue at the commencement of litigation, their claim is moot based on the settlement of a companion case that excludes the general public from using Cedar Beach. For the following reasons, the motion is denied.

## BACKGROUND

In their amended complaint, plaintiffs seek a declaratory judgment that the public has acquired a right to use Cedar Beach Road on Bailey Island in Harpswell, Maine by prescription (count I) or custom[1] (count II). Plaintiffs include Cedar Beach/Cedar Island Supporters, Inc., an entity "made up of

---

[1] Easement by custom has never been recognized as a viable cause of action in Maine. See Almeder v. Town of Kennebunkport, 2014 ME 12, ¶ 34, ___ A.3d ___.

members of the public who have previously enjoyed passage to Cedar Beach and Cedar Island by way of Cedar Beach Road, whose passage over Cedar Beach Road has recently been denied, and who are of the opinion and belief that they have a right to the continued use of Cedar Beach Road." (Am. Compl. ¶ 1; Pls.' Add. S.M.F. ¶ 1.) Plaintiffs also include several individuals who "previously enjoyed regular passage to Cedar Beach and Cedar Island by way of Cedar Beach Road." (Am. Compl. ¶¶ 3-5, 7-8.) Some of the plaintiffs in this case were also plaintiffs in a related case, Cedar Beach/Cedar Island Supporters, Inc. v. Aspatore, Cumberland Superior Court Docket No. CV-2013-344. (Supp. S.M.F. ¶ 5; Opp. S.M.F. ¶ 5.)

The Aspatore case has settled. (Gables S.M.F. ¶ 8.) The settlement agreement was conditioned on the acceptance of a public access easement on the Aspatore land by the Town of Harpswell, which has since been effected. (Gables S.M.F. ¶¶ 9-10.) Under the settlement agreement, as reflected in the proposed deed, the Aspatore defendants are required to deed an easement "for the benefit of the Inhabitants of the Town of Harpswell." (Gables S.M.F. ¶ 11.) The terms of the settlement agreement, as reflected in the proposed deed, also specify that use of the easement area is "limited to the Town, Town residents and their guests and Town non-resident taxpayers and their guests (meaning to include bed and breakfast guests and motel guests)." (Gables S.M.F. ¶ 12.) The Town is required to develop and implement a mechanism to reasonably ensure use of the easement area by authorized users only." (Pls.' Opp. S.M.F. ¶ 15.)

PROCEDURAL HISTORY

On October 24, 2012, plaintiffs filed their complaint. An amended complaint was filed on April 3, 2013. Defendants Abrahamsons and Gables

2

raised the affirmative defense of standing in their answers. Defendant Gables filed a motion for leave to file a motion for summary judgment, which was granted on April 11, 2014. Plaintiffs' motion for leave to file a surreply in opposition to the defendant motion for summary judgment was granted on 5/7/14.

## DISCUSSION

Gables argues both standing and mootness in its motion for summary judgment. "Standing and mootness are closely related concepts describing conditions of justiciability." Madore v. Maine Land Use Regulation Comm'n, 1998 ME 178, ¶ 8, 715 A.2d 157. "Standing to sue means that the party, at the commencement of the litigation, has sufficient personal stake in the controversy to obtain judicial resolution of that controversy." Halfway House, Inc. v. City of Portland, 670 A.2d 1377, 1379 (Me. 1996). "When a party initially holds the requisite personal interest, but is later divested of that interest" the doctrine of mootness applies. Madore, 1998 ME 178, ¶ 8, 715 A.2d 157. In deciding these issues on a motion for summary judgment, the court views the facts "in the light most favorable to the plaintiffs as the nonmoving party." Lougee Conservancy v. CitiMortgage, Inc., 2012 ME 103, ¶ 2, 48 A.3d 774.

1. Standing

"Whether a party has standing to bring a claim is a jurisdictional question." North East Ins. Co. v. Young, 2011 ME 89, ¶ 11, 26 A.3d 794. As the Law Court has explained:

> Litigants normally may not assert the rights of third parties but must demonstrate that they have received some particularized injury in order to have standing to raise their claim. A person has suffered a particularized injury when the other party's actions have adversely and directly affected that party's property, pecuniary or personal rights.

3

Id. (internal citations and quotations omitted).

The Law Court has never explicitly addressed whether an individual or private entity has standing to bring a claim for a public prescriptive easement. See Lyons v. Baptist Sch. of Christian Training, 2002 ME 137, ¶ 22 n.5, 804 A.2d 364. Without ruling on standing, the Lyons court noted:

> "(1) a public easement could be asserted by an individual as a defense to a trespass action, and (2) a declaratory judgment action, M.R. Civ. P. 57, would appear to be available to private individuals and entities where they have been barred from access to ways on lands that they previously used and, in good faith, believe they can continue to use due to a private or public prescriptive easement."

Id. In several cases, the Law Court has ruled on the merits of a claim by a private individual for a public prescriptive easement without addressing standing. Id. ¶¶ 26-31; Shadan v. Town of Skowhegan, 1997 ME 187, ¶¶ 6-7, 700 A.2d 245; S.D. Warren Co. v. Vernon, 1997 ME 161, ¶ 17, 697 A.2d 1280.

Gables's argument proceeds from the premise that plaintiffs must represent the general public to bring a declaratory judgment seeking a public prescriptive easement. To have standing, plaintiffs must allege that they have suffered a particularized injury different from that incurred by the general public. Buck v. Town of Yarmouth, 402 A.2d 860, 861 (Me. 1979). At trial, plaintiffs must show "use by people who are 'not separable from the public generally.'" S.D. Warren Co., 1997 ME 161, ¶ 17, 697 A.2d 1280 (quoting Inhabitants of the Town of Kennebunkport v. Forrester, 391 A.2d 831, 833 n.2 (Me. 1978)); see also Stickney v. City of Saco, 2001 ME 69, ¶ 18, 770 A.2d 592 ("[T]he test of a public use is the use of the road by people who are inseparable from the public generally . . . ."). Plaintiffs are not required to raise an issue of

4

fact regarding this element of their case at this stage to survive a motion for summary judgment with regard to standing.

The plaintiffs in this case have raised an issue of fact regarding standing. They allege that they have used Cedar Beach Road to access the beach, that use has recently been denied, and they believe they have the right to continued use of the road. (Am. Compl. ¶¶ 15, 6-9, 13; Pls.' Add. S.M.F. ¶ 1.) Because plaintiffs have alleged an injury distinct from that of the general public, they have raised an issue of fact regarding standing to bring a claim for a public prescriptive easement.

### 2. Mootness

Gables next argues that, even if plaintiffs had standing at the commencement of the suit, their claim is now moot because of the settlement in the Aspatore case. The test for mootness is "whether there remain sufficient practical effects flowing from the resolution of the litigation to justify the application of limited judicial resources." Halfway House, Inc., 670 A.2d at 1380 (quoting Employee Relations v. Labor Relations Bd., 655 A.2d 326, 327-28 (Me. 1995)). A case is moot "if the passage of time and the occurrence of events deprive *the litigant* of an ongoing stake in the controversy although the case raised a justiciable controversy at the time the complaint was filed." Halfway House, Inc., 670 A.2d at 1379-80 (emphasis added).

In spite of the settlement in the Aspatore case, plaintiffs have raised an issue of fact regarding their having an ongoing stake in the controversy. If they prevail in this case, plaintiffs will be able to use Cedar Beach Road to access and use the beach as provided by the settlement agreement in the Aspatore case. The

5

fact that the general public may be precluded from using the beach does not render plaintiffs' claim moot.

The entry is

Defendant Gables's Motion for Summary Judgment is DENIED.

Date: May 9, 2014

Nancy Mills
Justice, Superior Court

6

5/9/2014

DAVID BERTONI ESQ          -014-
ANN TORREGROSSA ESQ
BRANN & ISAACSON
PO BOX 3070
LEWISTON ME 04243-303


RICHARD ABBONDANZA ESQ
GERALD SCHOFIELD JR ESQ
HOPKINSON & ABBONDANZA
511 CONGRESS ST
SUITE 801
PORTLAND ME 04101


CHRISTIAN CHANDLER ESQ    Intervenor
CURTIS THAXTER
PO BOX 7320
PORTLAND ME 04112-7320

5/9/2014

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-12-392

STATE OF MAINE
Cumberland, ss. Clerk's Office

MAY 0 2 2014

RECEIVED

CEDAR BEACH/CEDAR
ISLAND SUPPORTERS, INC.,
et al.,

        Plaintiffs

v.

CHARLES H. ABRAHAMSON,
et al.,

        Defendants

and

WELLS FARGO BANK, N.A.,

        Party-in-Interest

ORDER ON PLAINTIFFS
AND DEFENDANTS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT

Before the court is plaintiffs' motion for partial summary judgment. Plaintiffs argue defendants cannot raise a genuine issue of material fact regarding whether a notice posted in 1962 on property now owned by the Abrahamson defendants prevented the public from acquiring an easement by prescription over a portion of Cedar Beach Road on Bailey Island in Harpswell, Maine. Plaintiffs ask for a ruling that the 1962 notice does not apply to the Cedar Beach Road. Defendants ask for a ruling that the notice does apply to Cedar Beach Road. For the following reasons, the motions are denied.

BACKGROUND

In their amended complaint, plaintiffs seek a declaratory judgment that the public has acquired a right to use Cedar Beach Road on Bailey Island by

1

prescription, count I, or custom, count II. In defendants' answers, the 1962 notice is raised as an affirmative defense to the acquisition of a prescriptive easement.

In 1957, Julia Sturtevant and Meredith Starbranch acquired a cottage and all the land surrounding the cottage and adjoining Cedar Beach Road on Bailey Island. (Supp. S.M.F. ¶¶ 1-2.) In 1961, Ms. Sturtevant and Ms. Starbranch acquired Cedar Beach Road; the deeds contain the language, "subject to the rights of others in common to use said Beach Road as a right of way." (Supp. S.M.F. ¶¶ 8-11.) On December 27, 1961, Ms. Sturtevant and Ms. Starbranch conveyed a portion of their land and a right of way over Cedar Beach Road to Margaret E. Seamans. (Supp. S.M.F. ¶¶ 12-13.) Ms. Sturtevant and Ms. Starbranch retained a 2.71 acre parcel, referred to as the "Ridge Lot" in the Seamans deed. (Supp. S.M.F. ¶ 14.) The deed to Ms. Seamans contained language that the grantors reserved rights to connect utilities, "to two houses on the Ridge Lot, the area retained by the Grantors, and buy water service . . . if at any time in the future houses are built on said retained area which consists of 2 ¾ acres on the eastern shore of Fresh Water Cove." (Supp. S.M.F. ¶ 15.) The deed also contained language that referred to Cedar Beach Road as a parcel separate from the Ridge Lot. (Supp. S.M.F. ¶ 16.)

In September 1962, Ms. Starbranch posted a "Notice to Prevent Acquisition of Right of Way or Easement" on her property and filed the notice in the Cumberland County Registry of Deeds.[1] (Supp. S.M.F. ¶ 19.) In her affidavit, Ms. Starbranch states she posted notices, "to prevent acquisition of a right-of-

---

[1] Defendants dispute whether the notice was posted solely for the Ridge lot but do not dispute that Ms. Starbranch posted a notice on her property. (Abrahamsons' Opp. S.M.F. ¶ 19; Gables's Opp. ¶ 19.)

[2] Defendant Gables owns a deeded easement over Cedar Beach Road. (Gables's Add. S.M.F. ¶ 46.)

[3] The operative law in 1962 was identical to current law. R.S. ch. 174, § 12 (1954). The

2

way or other easement in or over her land in conspicuous places upon her land commonly known as the 'Ridge' property, that being the lot of approximately 2 3/4 acres on the shore of Fresh Water Cove." (Supp. S.M.F. ¶ 20; Abrahamson Opp. S.M.F. ¶ 20; Gables Opp. S.M.F. ¶ 20.) She also refers in her affidavit to two photographs. (Abrahamson & Gables Add. S.M.F. ¶ 34; Pls.' S.M.F. ¶ 19, Eisenstein Aff. Ex. G.) There was a chain across Cedar beach Road connecting two posts during the 1962 notice period. (Abrahamsons & Gables's Add. S.M.F ¶¶ 35, 38.)

PROCEDURAL HISTORY

On October 24, 2012, plaintiffs filed their complaint, which they amended on April 3, 2013. Defendant Gables, LLC[2] filed a motion to intervene, which was granted on April 8, 2013. Plaintiffs filed their motion for partial summary judgment on December 5, 2013. Defendant Gables and defendants Abrahamsons filed separate oppositions to plaintiffs' motion for summary judgment. On April 11, 2014, the Court granted defendant Gables's motion to supplement the summary judgment record with the affidavit of Harry Starbranch, the son of Meredith Starbranch.

DISCUSSION

1. Standard of Review

Under Rule 56, a party may move for summary judgment on a claim "or any part thereof." M.R. Civ. P. 56(a). "Summary judgment is appropriate when there is no genuine issue of material fact that is in dispute and, at trial, the parties would be entitled to judgment as a matter of law." Fitzgerald v. Hutchins, 2009

---

[2] Defendant Gables owns a deeded easement over Cedar Beach Road. (Gables's Add. S.M.F. ¶ 46.)

3

ME 115, ¶ 9, 983 A.2d 382 (citing Dyer v. Dep't of Transp., 2008 ME 106, ¶ 14, 951 A.2d 821). "An issue is genuine if there is sufficient evidence supporting the claimed factual dispute to require a choice between the differing versions; an issue is material if it could potentially affect the outcome of the matter." Brown Dev. Corp. v. Hemond, 2008 ME 146, ¶ 10, 956 A.2d 104 (citing Univ. of Me. Found. v. Fleet Bank of Me., 2003 ME 20, ¶ 20, 817 A.2d 871).

Defendants "bear the burden of making a prima facie showing of each element of" their defense. Rutland v. Mullen, 2002 ME 98, ¶ 8, 798 A.2d 1104; see also Martinez-Rodriguez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010) ("With respect to each issue on which the nonmoving party has the burden of proof at trial, that party must 'present definite, competent evidence to rebut the motion.'") To avoid summary judgment, the non-moving party cannot rely "merely upon conclusory allegations, improbable inferences, and unsupported speculation." Dyer, 2008 ME 106, ¶ 14, 951 A.2d 821 (quoting Vives v. Fajardo, 472 F.3d 19, 21 (1st Cir. 2007)).

2. 1962 Notice

By statute, a landowner may prevent others from acquiring rights through adverse use by posting a notice as follows:

> If a person apprehends that a right-of-way or other easement in or over his land may be acquired by custom, use or otherwise by any person, class of persons or the public, he may give public notice of his intention to prevent the acquisition of such easement by causing a copy of such notice to be posted in some conspicuous place upon the premises for 6 successive days . . . . A certificate by an officer qualified to serve civil process that such copy has been served or posted by him as provided, if made upon original notice and recorded with it, within 3 months after the service or posting in the registry of deeds for the county or district in which the land lies, shall be conclusive evidence of such service or posting.

4

14 M.R.S. § 812 (2013).[3] In this case, there is no "certificate by an officer qualified to serve civil process," which would be "conclusive evidence" of posting. (Supp. S.M.F. ¶ 20.) Accordingly, defendants must raise a genuine issue of material fact that the 1962 notice was "posted in some conspicuous place upon the premises for 6 successive days" to avoid summary judgment. 14 M.R.S. § 812.

Plaintiffs argue the evidence shows Cedar Beach Road and the Ridge lot are separate parcels. They argue that, because the 1962 notice refers only to the Ridge lot, the notice did not prevent the public from acquiring rights over Cedar Beach Road. Plaintiffs support this argument by stating the Road lot and the Ridge lot, if taken together, would constitute approximately 3 acres.[4] The notice references a 2 3/4 acre lot, which is closer in size to the 2.71 acres of the Ridge lot alone.

Defendants claim the notice applied to all of Ms. Starbranch's property, including Cedar Beach Road. (Abrahamsons & Gables's Opp. S.M.F. ¶ 22.) They argue first that the statute does not require a precise description of the land posted. 14 M.R.S. § 812. The statute requires a person who is concerned about an easement "in or over his land" to post a notice is some conspicuous place. In her affidavit, Ms. Starbranch states she "posted two notices of her intention to prevent the acquisition of a right-of-way or other easement in or over her land in conspicuous places . . . ." The affidavit itself raises a genuine issue of material fact regarding whether the notice applied to Cedar Beach Road.

---

[3] The operative law in 1962 was identical to current law. R.S. ch. 174, § 12 (1954). The current statute is cited in this order for convenience.

[4] Defendants argue plaintiffs cannot establish the size of the Cedar Beach Road parcel because they failed to designate an expert surveyor. The dimensions of the parcel are clear from the facts, however, and it is a simple calculation from those dimensions to determine the size of roughly 0.28 acre. (Supp. S.M.F. ¶ 7; Eisenstein Aff. ¶ 11.)

5

Defendants also argue that because the Road lot abutted and is contiguous to the remainder of the Sturtevant/Starbranch property, the lots merged. See Fitanides v. Holman, 310 A.2d 65, 67 (Me. 1973). Accordingly, defendants argue the notice applied to all of the Sturtevant/Starbranch land. Plaintiffs filed a motion to strike this legal argument pursuant to Rule 12(f). M.R. Civ. P. 12(f); see also M.R. Civ. P. 56(i)(1). Rule 12(f) applies to pleadings. Further, defendants are not proposing a new cause of action; they are stating the law. Defendants have not waived the ability to argue the law.

Defendants next rely on the proposed expert testimony of Attorney Ronald Bissonnette. Defendant Gables designated real estate attorney Ronald Bissonnette as an expert. After reviewing the documents in this case, he opined: "a prudent attorney skilled and experienced in examining title could not conclude that the 1962 Notice does not encompass, include, or refer to the earth described as the Beach Road owned by Meredith Kells Starbranch and Julia Sturtevant at the time of the 1962 Notice." (Abrahamson Add. S.M.F. ¶ 32; Gables Add. S.M.F. ¶ 31.) He further states that "the Notice could very well pertain to the Beach Road, thereby foreclosing any opportunity to claim an easement . . . ." (Abrahamson Add. S.M.F. ¶ 33; Gables Add. S.M.F. ¶ 32.) Finally, he states, "the [1979] letter leads me to conclude that the 1962 notice was intended to include the Beach Road, although that is a factual determination that I would leave to the factfinder." (Pls.' Am. Reply S.M.F. ¶¶ 31-32.)

Under Rule 702 of the Maine Rules of Evidence, if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise." M.R. Evid. 702. "Although the expert need not be able to

6

state his opinion with any special degree of certainty, he must be able to provide some insight beyond the kind of judgment an ordinarily intelligent juror can exert." State v. Woodburn, 559 A.2d 343, 346 (Me. 1989). When applying Rule 702, "the trial court must consider whether the matter is beyond common knowledge so that the untrained juror will not be able to determine it intelligently and whether a person with specialized knowledge can give a helpful opinion." Pelkey v. Canadian Pac. Ltd., 586 A.2d 1248, 1254 (Me. 1991). The issue is whether a "notice [was] posted in some conspicuous place upon the premises for 6 successive days." That matter is not beyond common knowledge.[5]

Finally, defendants rely on the supplemental affidavit of Harry Starbranch, Meredith Starbranch's son. Although Attorney Starbranch does not have personal knowledge of the 1962 posting, he states in his affidavit that his family "consistently and regularly attempted to prevent the general public from using Cedar Beach Road as an access to Merry's Cove or Cedar Beach . . . ." (H. Starbranch Aff. ¶ 6.); Gilbert v. Curtis, 37 Me. 45, 49 (1854). He states further, "the only access to the cove or the beach was along the road." (H. Starbranch Aff. ¶¶ 7, 15.) Based on Mr. Starbranch's testimony, a genuine issue of material fact has been raised regarding whether the 1962 posting to apply to Cedar Beach Road.

The entry is

Plaintiffs' Motion for Partial Summary Judgment is
DENIED.

---

[5] Even assuming specialized knowledge would help the trier of fact in this case, Attorney Bissonnette's, testimony provides only that there is an issue of fact as to whether the notice applies to Cedar Beach Road. His testimony is insufficient to support a summary judgment in favor of the defendants, as they request. (Gables's Mem. at 8-9; Abrahamson Mem. at 11.)

7

Defendants' Motion for Partial Summary Judgment is
DENIED.

Date: May 1, 2014

Nancy Mills
Justice, Superior Court

RE-12-392

8

5/1/2014

DAVID BERTONI ESQ                _Pity_
ANNE TORREGROSSA ESQ
BRANN & ISAACSON
PO BOX 3070
LEWISTON ME 04243-303

CHRISTIAN CHANDLER ESQ   _Def Cables_
CURTIS THAXTER
PO BOX 7320
PORTLAND ME 04112-7320

RICHARD ABBONDANZA ESQ   _Def Abrahamson_
GERALD SCHOFIELD JR ESQ
HOPKINSON & ABBONDANZA
511 CONGRESS ST
SUITE 801
PORTLAND ME 04101